THOMAS O. BURTON, APPELLANT, *vs.* WILLIAM L. SMITH AND OTHERS, APPELLEES.

Under the laws of Virginia in relation to lands of which the debtor has an actual seisin, although there is no statute in Virginia which expressly makes a judgment or lien on the lands of the debtor, yet during the existence of the right of the plaintiff to take out an elegit, the lien of the judgment is universally acknowledged.

All the authorities, ancient and modern, agree in this proposition, that a reversion after an estate for life is assets, or, as some of the books express it, quasi assets, in the hands of the heir, in regard to the bond of the ancestor, binding heirs; and that in such case, the plaintiff may take judgment of it, quando acciderit. . Upon principle, it would seem to be clear, that whatever estate descended to the heir, which was liable as assets to the bond debt of the ancestor, must be bound by a judgment obtained against the ancestor in his lifetime.

There is a current of authorities going to prove that a reversion after an estate for life is bound by a judgment obtained against the ancestor, from whom it immediately descended.

So far from its being proper for a Court to hesitate about decreeing a sale of an interest because it is reversionary, the character of the interest affords a stronger reason for such a decree. For although in regard to property in present actual possession, the elegit, although tardy in its operation, yet is in some degree an effective remedy, inasmuch as the creditor will by that means annually receive something towards his debt; whereas, in the case of a dry reversion, if the outstanding life estate should continue during half a century, the creditor might look on in hopeless despondency, without the possibility of receiving a cent from that source, except through the interposition of a Court of equity in decreeing a sale.

It is the very nature and essence of a lien, that no matter into whose hands the property goes, it passes cum onere. If this were not the case, it would cease to be a lien.

APPEAL from the Circuit Court of the United States for the eastern district of Virginia.

The case, as stated in the opinion of the Court, was as follows:

"In the month of June, 1827, Smith and Kennedy obtained a judgment in the Circuit Court, against Reuben Burton, for $1348 75, with interest from the 14th of October, 1823, and costs. On this judgment an elegit was issued, on the 31st of December, 1827. On the 12th of August, in the same year, Reuben Burton, by deed conveyed his real estate to certain trustees, in trust, to sell the same for the benefit of his creditors; amongst many other debts enumerated in the deed, the judgment already mentioned, recovered by Smith and Kennedy, was included.

These last mentioned creditors, the appellees, never assented to, or accepted anything under the trust deed. Burton having died; the only trustee who accepted the trust, on the 21st of December, 1829, sold, under the deed, all the estate, both real and personal, conveyed by it; and at that sale, Sarah Burton, by her agent, purchased, at the price of $1000, the interest of Reuben Burton, that is, two-fifth parts of a certain tract of land called Springfield, supposed to contain about five hundred acres, and also his interest in certain coal pits on the same tract. The character of Reuben Burton's interest in the Springfield tract of land, as appears from the record, was that of a reversion in fee after an estate for life. And the cha-

racter of his interest in the coal pits, as appears from an agreement in the record, was this: The heirs of Daniel Burton, of whom Reuben Burton was one, were to have, during the widow's life, the right of occupying, using, and working the coalpits, and the right and power of sinking shafts, and searching for coal on any part of the land, except the yard, &c., paying to the widow, during her life, the yearly sum of $200, for her dower interest. The same agreement will show his interest in a mineral spring included in the decree.

After the death of Reuben Burton, the appellees, finding that there was no personal estate to satisfy their debt, in September, 1834, filed their bill to enforce the lien created by their judgment; making, amongst others, Sarah Burton a defendant, as purchaser of the interest of Reuben Burton before described, in the Springfield tract of land and coal pits.

She answered, saying, that the property conveyed to her was not purchased for her own benefit, but for the benefit of her son Thomas O. Burton, the appellant. She insisted, in her answer, that the appellees had no right to enforce their judgment, as more than five years had elapsed since the death of Reuben Burton. She denied that the judgment created any lien on the property purchased by her, which was valid against her. She insisted that the appellees were entitled to no relief in equity; and that, at all events, a sale should not be decreed.

An amended bill was thereupon filed, making Thomas O. Burton a defendant. He filed an answer, insisting on the grounds taken by Sarah Burton.

The cause coming on to be heard, the Court held: the reversionary interest of Reuben Burton in the Springfield tract of land, and his interest in the right of occupying and working the coal pits thereon, and, also, his interest in the mineral spring thereon, with the twenty-five acres of land adjoining thereto, liable to the appellees' judgment; and decreed a moiety of Reuben Burton's interest to be sold." From this decree an appeal was taken."

The case was submitted to the Court on printed arguments, by Mr. Lyons, for the appellant; and by Mr. Robinson for the appellees.

The argument of Mr. Lyons was as follows:

The appellant insists that the decree of the Circuit Court is erroneous, and ought to be reversed. 1st, Because the judgment in favour of the appellees against Reuben Burton, gave no lien upon the interest or share of Reuben Burton in the Springfield coal property, which was purchased by Sarah Burton for the appellant; and which, by the decree of the Circuit Court, was adjudged to be sold.

By the common law a judgment conferred no lien upon lands. That lien is the result entirely of the power to extend the lands; and is therefore a statutory power conferred by the act commonly called

the statute of Westminster. This position is known to be familiar to the Court; but if authority is desired for it, it may be found in the opinion of Lord Hardwicke, in the case of Stileman vs. Ashdown, 2 Atkyns' Reports, 608, and every subsequent decision upon that subject; and especially in the opinion of the late Chief Justice of the United States, in the case of the Bank of the United States vs. Winston et al., 2 Brockenbrough's Reports, 252; which is quoted, not only because of the high character of the authority, and the just weight which will be attached to it, but because of the distinct and emphatic manner in which the position is laid down, and the rights of the party claiming under the judgment are, in a Court of equity, limited and confined to the right and power conferred by the judgment. The first inquiry then is, could the appellees have extended the interest before mentioned, of Reuben Burton in the Springfield coal lands? It is submitted that they could not. It will be perceived by the Court, that the entire tract of land upon which the Springfield pits are, with the houses, &c., constituted the mansion establishment of Daniel Burton, the father of Reuben, who died intestate, leaving a widow, Sarah Burton, and several children. Until dower was assigned the widow she had the right to retain the mansion establishment, and to derive her maintenance from it. While it remained in that condition, therefore, it is assumed that no elegit could be levied upon it; because if an elegit issue against one child, so might one issue against each child; and thus the whole would be taken and put into the possession of the creditors, and the widow expelled, and kept out, until by her writ she was restored. The children could not lawfully expel the widow; the creditors of the children, standing in their place, could not of course do it. If all could not do it, surely one could not. The lands in the hands of the widow before assignment of dower, could not therefore be taken under an elegit. No assignment of dower has taken place, unless the Court shall regard the agreement entered into by Mrs. Burton and her children (exhibited by defendants,) as such assignment. Is the condition of the appellees aided by that paper? It is submitted that so far from it, the condition is made worse. If that agreement had not been entered into, any creditor of Reuben Burton might have filed his bill against the widow and heirs, and compelled an assignment of dower, which being made, he might have levied his elegit upon the share of Reuben Burton; but this agreement deprives the appellees of that power, because it is founded upon a good as well as valuable consideration—was entered into before any right existed in the appellees—and assigns to the widow, for her dower, the entire tract of land, except the mineral spring, with twenty-five acres, and the right to work the coal mines, and charges them with an annuity of two hundred dollars per annum to the widow. The rights of the appellees, in respect to this property, are manifestly less than if the agreement had not been entered into. Could Reuben Burton's interest in the coal mines and spring, with the twenty-five acres, have been taken under an elegit, after the execution of the said agree-

ment? It is respectfully submitted that it could not. By the inquisition under the elegit the property is placed in the hands of the creditor, who takes all the profits of it, paying therefor a fair annual rent, to be applied as a credit against his claim; and of the portion thus placed in his hands no one has a right to share the profits with him. If this may be done in favour of the creditor of one child, it may be done for the creditors of each; and if two elegits issue at the same time against the same defendant, they take not a moiety but the whole: and thus the widow who has renounced her claim to dower in the other lands of her husband, and thereby suffered them to pass away from her, is to be again ousted and deprived of the annuity, in consideration of which, in great part, she has made her relinquishment under an agreement with the heirs, which is obligatory upon them, and as effectual to charge the property with the rights of the doweress as any which could have been resorted to. It is not necessary to the validity of an assignment of dower that it should be registered: i. e. recorded as a conveyance. If it is, however, and this agreement is to be affected by the failure to register, (although as to one of the parties it was fully proved, being acknowledged, and should have been recorded,) then it cannot diminish the rights of the widow, and the argument upon the hypothesis that no assignment has been made, applies.

If land is subject to a trust for the use of a grantor and another, e. g. to raise an annuity, and a judgment is rendered against the grantor, the land cannot be taken by elegit. Doe on demise of Hull. *vs.* Green Hill, 4 Barnwell and Alderson, 684. In the present case the land was subject to a trust, and one of the uses charged upon it was to raise an annuity. The agreement here being a case of dower, was as valid to charge it as any form of conveyance, and so to protect it; the reason is the same in each—the right of the annuitant.

What, then, it may be asked, were the rights of the appellees in reference to this property, when they obtained their judgment? They were two-fold—either to take Reuben Burton under a ca. sa., and thus acquire his rights whatever they were in the subject, and by express provision of the execution law, the right to sell them; or upon the return of the fi. fa., to file a bill for an account of the rents and profits of the coal mines, and for a receiver, and a decree for the satisfaction of the judgment out of it. In the lifetime of Reuben Burton they could have done no more. An account of rents and profits cannot be had in the lifetime of the debtor, even after removing a fraudulent conveyance, if an elegit can be levied; and the power of a Court of equity to sell the lands in such a case is clearly repudiated by Lord Hardwicke in the case of Higgins et al. *vs.* The York Buildings Company, 2 Atkyns, 107. The proceeding to judgment at law, and the "lis pendens" to enforce it in equity, would have given it, if not a lien exactly, a preferable claim; and a purchaser even for valuable consideration, would have been bound as a purchaser with notice. If a ca. sa. had been executed after the conveyance, the lien of the judgment would have been lost.

[Burton *vs.* Smith et al.]

In the absence of a "lis pendens," and when, if this view be correct, the appellees had not the power to extend by an elegit, and had therefore no lien—viz. on the 12th day of August, in the year 1827, Reuben Burton conveyed the property to trustees for the benefit of his creditors. In the month of December, in the year 1829, more than two years after the rendition of the judgments, during the whole of which time no attempt was made to enforce the judgment as against the coal lands by the appellees, who are among the creditors enumerated as the persons for whose benefit the deed of trust is made—a sale of the subject is made under the deed of trust by public auction, and the appellant became the purchaser. No step had been taken, nor any act done by the appellees indicating their dissent from the deed of trust, nor was any such step taken until the month of September, in the year 1834, more than seven years after the judgment was rendered. In the answer all knowledge of the judgment of the plaintiff, as affecting the coal property at least, is denied; the impression it seems being that an elegit had been levied upon other lands; and it is thought the evidence sustains the answer.

Certainly the answer is not overthrown by the requisite degree of proof—there being only one witness to oppose it; and that witness is opposed in his present recollections by his own written statement made at the time of the sale

The appellant stands then in the position of a purchaser for a valuable consideration, of property upon which the appellees had acquired no lien, and to which, with equal equity, the appellant holds the legal title. In such a case, the purchaser is entitled to the protection of a Court of equity: but if he is not, he is certainly not the proper object for the vindictive exercise of its power, and the Court of equity will leave the adversary creditor to his legal rights. Sugden on Vendors, sec. 5, 338—344, and the opinion of Judge Green in Coutts *vs.* Walker, 2 Leigh's Reports, 268. The space allowed in this form of argument will not permit a comment on the reason of this rule, if it were necessary. Its justice is apparent: the fair purchaser for a valuable consideration has, upon every principle, at least as much equity as the sleeping judgment creditor—one who sleeps for seven years. And why should a Court of equity seek to turn the scale against him—equity, which always follows and only aids the law? In such a case the proper language of equity is: "I cannot aid you against one who is equally entitled to my sympathy: if you have any legal advantage over him, assert it: I cannot, and would not if I could, prevent you; but I can do no more." Here the case is peculiarly strong for the application of the rule. The judgment creditor has, to say the least, been guilty of the most culpable laches. He has laid by for seven years—during which time he took no step against the deed, or the property in question—the property of his debtor, conveyed to secure the payment of his among other debts by a conveyance which gave a priority over him, is sold; and the money

[Burton *vs.* Smith et al.]

arising from the sale applied according to the provisions of the deed —more than two years having elapsed between the rendition of the judgment, and the sale under the deed. Here was time most ample for any purpose, and if any step had been taken by the creditor, the priorities of the parties would have been settled and the purchase money paid over accordingly. Passing by all this—after the trustee has misapplied the purchase money, as the judgment creditor contends, he comes into a Court of equity to ask as against the purchaser, that which he cannot obtain at law. No principle is conceived upon which the claim preferred can be sustained.

II. If the judgment did confer a lien, then the appellees, in the case as it now appears to the Court, i. e. unless it appeared that the profits would not in a reasonable time pay the debt, had no claim whatever to the aid of a Court of equity: that equity follows the law and only aids it, is a principle too familiar and well known to need authority; and has been expressly affirmed in respect to this very question of a lien of a judgment by Lord Hardwicke, in a case already referred to, 2 Atkyns, 107; and in other cases to which there may be occasion to refer. The power of a Court of equity over the lands of a debtor by judgment is the consequence of the right acquired by the creditor to redeem prior incumbrances. This is the source and fountain of the power; and if the prior mortgages or incumbrances will not permit him to redeem, or if he is not able to redeem without a sale of the lands; he may apply to a Court of equity to compel a redemption; and therefore a sale of the property. Sugden, 340.

By degrees, in the absence of any law or legal principle to sustain them, the Courts have extended their power; and commencing with the principle of aiding and following the law, they have arrived at the conclusion, that they may do that which the law could not do, and sell the land. But this has been, not in a case like that before the Court, but in cases as it will be presently shown, founded upon obligations which bound the heir. But to recur: did the judgment, in the case before the Court, give a lien upon the lands? If it did, then it is respectfully submitted, that the appellees, in the case they have made, had no claim to the aid of a Court of equity; because there was nothing to impede their progress, and remedy at law. In the case before cited, 2 Atkyns, 107, where the debtor was living, Lord Hardwicke decided, that the Court of Chancery had the power to remove a fraudulent conveyance; it being a principle of equity jurisdiction that where fraud in fact is charged, a Court of equity therefore has jurisdiction, because from its more comprehensive power it can more fully try the fraud, although a Court of law is competent to try it. But having done that, its power ceases, and the parties must be left to their remedy at law upon the elegit; and in the case of Wilders. *vs.* Chambliss, administratrix, and heirs; 6 Munford, 432, the Court of appeals of Virginia affirmed a decree of Chancellor Taylor, dismissing the bill of the judgment creditor upon the ground that the elegit was the remedy; it appearing in that case

that the profits of the land would in a reasonable time discharge the debt. Here is a decision upon the point when the debtor was alive, and another when the debtor was dead, concurring in both cases; the claim resting upon an obligation which bound the heirs. . It will be shown presently that the latest Virginia decisions concur with that last cited; at least in this, that the land should not be sold when the rents and profits will in a reasonable time discharge the debt.

Looking to the reason of the thing, it may well be asked upon what ground it is that a Court of equity should deny itself the power to sell the land when the debtor lives; and yet as soon as he dies and his children have become more helpless, and therefore entitled to the care of the Court, it shall assume the power to sell the lands to satisfy the very same debt. There is no reason for it, unless in a case in which the obligation binds the heir; and then, as the heir is chargeable to the whole extent of assets descended, the Court of equity may, without much stretching its power, order the sale. It is believed that the power has resulted from confounding the power to redeem prior incumbrances, and the practice in marshalling assets and securities, whereby an entirely new power has been made; not justified by the first head, as the authorities cited show, and not justified by the latter, as will be seen by consulting any work upon the subject, as the latest and most luminous of which, Story's Equity, titles Marshalling Assets, and Marshalling Securities, is referred to. The practice of selling when the obligation binds the heirs, if it be established, cannot furnish authority for selling in a case like that before the Court, because the judgment does not bind the heir. Stileman *vs.* Ashdown, 2 Atkyns, 477. Nor can any authority be derived from the other heads; because in those cases there *must* be two securities, and two funds. Here there was but one fund and one security, and nothing therefore to marshall, i. e. to array and arrange, so as to promote justice and equity.

It is thought, however, that the Court will find in most, if not all the cases in which decrees for sales have been made, that the case came into Court under the power to redeem, as in Stileman *vs.* Ashdown, or to marshall, or upon claims binding the heirs in some form. In this case not one of these qualities exists. There is nothing to redeem; if there is, the plaintiff does not ask that privilege: there is no fraud alleged; there is nothing to marshall; and the claim was originally on a simple contract, and therefore did not bind the heirs; and the judgment does not bind the heirs. The case then presents these peculiarities. One man has a simple contract claim against another: he sues him, and obtains judgment. If he pleases he may extend his lands, but he cannot sell them: he extends them, and the debtor dies, and by that event a power is conferred to sell the land, although the reason against selling may be and generally is stronger after the death of the ancestor than before. To the heir it may be a matter of great importance to be enabled to pay the debt off by the gradual process, or at least to keep it out of the market, where it may be sacrificed at a sheriff's sale; until he can acquire

the means to prevent the sacrifice... How is it that the death of the father shall confer the power to do that which could not be done while the father lived? Why should it be so? If it be said that here the elegit was not actually levied in the lifetime of the debtor; that only weakens, if it affects at all the case. Then the case stands thus: the land descends to the heir, and comes into his possession; the creditor pursues with a claim which does not bind the heir, and which if carried to its utmost extreme, could only take possession for a limited time of a moiety of the land; the heir is ready to yield the land to the whole extent to which it was liable in the life-time of the ancestor, and yet he is to be told this shall not be: he must pay immediately the debt for which he is not bound, and for the satisfaction of which not even the other moiety of the land could be touched; for which in the lifetime of his ancestor no foot of the land could have been sold, or the entire moiety must be sold. Whence the right thus to abridge the right of the heir? Let it be supposed that the profits of the land would in three years pay off the debt, and the property is of that description which at a forced sale is almost invariably sacrificed, and such is emphatically coal property; whence is derived the power to doom him to this sacri-fice, and put his property into the possession of his creditor, perhaps at half its value? Where is the justice and equity of the proceed-ing? Many other illustrations might be given, but the limits of a written argument forbid it.

Thus far the question as affecting the heir has been discussed; but the case is really against a fair purchaser, who is liable only; and can be proceeded against as terre tenant. Is there a case in which the power of the creditor has been enlarged as against him? Upon what ground is it that he shall be doomed to a sacrifice of that pro-perty for which he has fairly paid; and which, in the hands of the man from whom he purchased it, would not have been liable to such sacrifice? Is it not enough, in such a case, that the creditor may pay himself by the use of the property? With him there is no privity, no liability, not strictly legal; the purchase of the land may have deprived him of the means to redeem; and it may be that the land will soon pay the debt. Could his land have been sold in the lifetime of the vendor? Clearly not, as it could not be sold in the hands of the vendee. How can the subsequent death of the vendor so operate upon the vendee, as to make that property liable to sale after the death, which was not liable before? There can be no pretext of redeeming, nor of marshalling either assets or securities; for the land, at the death of the vendor was no part of his estate. No reason is seen, and no authority is known for it, in a case like the present.

III. If the appellees had a right to come into a Court of equity, it was because of a valid lien (which is denied) that could not be enforced at law; and, in that case, they were entitled to an account only of the rents and profits accruing, and the application of them to the payment of the debt.

In Coutts vs. Walker, 2 Leigh's Reports, 268, land was settled to the use of the grantor and his wife while they lived—to pay the wife an annuity if she survived; and, at her death, to be divided among the children of the grantor. The wife survived; and during her life judgments were rendered against one of the sons. The judgment creditor filed his bill to subject the son's interest; and the Court of Chancery decreed a sale of it, subject to the rights of the widow, as in this case. The Court of appeals reversed the decree, and directed an account of profits: deciding that the plaintiff was not entitled to a sale, but must be paid out of the profits.

In the case before the Court, the agreement with Mrs. Burton places the property, as to the debtor, just where the settlement in Coutt's case did: subject to the annuity, he was entitled to his share of the profits and the reversion in fee. The case seems to be in point directly. In a later case, Tennant's heirs vs. Patton, 6 Leigh, 196, the same Court reversed a decree for sale; and decided, that where the rents and profits would in a reasonable time pay the debt, it must be paid from them. And in the case of Mann vs. Flynn, recently decided, (the opinion pronounced by Judge Stanard,) the same Court affirm the case in 6 Leigh. The manuscript opinion is now offered to the Court, by the favour of Mr. Leigh.

The case of the United States vs. Morrison et al., in this Court, has been relied upon. That case was ruled chiefly upon authority of Coleman vs. Cocke et al., 6 Randolph. Now, it so happens that in Coleman vs. Cocke, the question was not raised as appears by the case; and Judge Green, moreover, expressly so declares in Blow vs. Maynard, 2 Leigh, 29.

IV. It is insisted that the appellees, having made no objection to the deed of trust although two years elapsed after it was made, and before it was acted upon; and taken no step to prevent the sale, are to be presumed to have acquiesced in it: and by their laches, have lost the right to impeach the sale; especially as nearly five years more elapsed after the sale before any move was made. The trustee is the agent of the grantor and cestui que trust; and if any wrong has been done, it has been by their agent; and to him the appellees should look.

V. An account of the administration of Reuben Burton's estate should have been ordered, whereby the appellant might have shown a personal fund adequate to the payment of the debt.

VI. An account of the rents and profits of the coal property should have been ordered; and the surplus, after paying the annuity, applied to the payment of this debt, if it was to be paid from the land in any form.

VII. The widow and heirs of Daniel Burton should have been parties to this suit; the widow at least.

VIII. The judgment was dead and inoperative when the decree was rendered; and no decree should have been rendered upon it until it was revived, if it could be. If it could not be, then no decree could be founded on it.

[Burton *vs.* Smith et al.]

For the foregoing reasons, it is asked that the decree of the Circuit Court may be reversed, and the bill dismissed; or, if that may not be, that it be reversed and modified according to the views herein submitted.

In reply to the argument for the appellees, the counsel for the appellants said; the cases relied upon are cases binding the heirs; and the question was, what constituted assets under the plea of "Reins per descent." In such cases, the heir who inherits a valuable reversion cannot make the plea; the reversion is assets in his hands. This is emphatically the case in Tindales *vs.* Warre, 4 Eng. Condensed Chancery Report. But, it is repeated, that when the right of the creditor depends upon the power of the elegit, a dry reversion is not liable, because it cannot be extended. It is believed, with due submission, that no such case can be found. How can you extend, at a yearly rent, that which, by the terms of the proposition has no yearly value? What would be the condition of the creditor, whose debt was annually wasting away by the use of a thing which was not susceptible of use? Who was accounting annually for the profit of that which could not yield profit?

Mr. Robinson for the appellees.

In the Court below, the statute of Virginia was relied on which declares that no action of debt shall be brought against any executor, or administrator, upon a judgment obtained against his testator, or intestate, nor shall any scire facias be issued against any executor, or administrator, to revive such judgment after the expiration of five years from the qualification of his executor, or administrator. 1 R. C. p. 492, § 17. A single answer to this objection will suffice. The qualification of Reuben Burton's administrator, was on the 9th of December, 1829. This suit was brought the 15th of September, 1834. It was, therefore, brought before the expiration of five years from the qualification; and the statute does not apply. This being the case, it is unnecessary to urge upon the Court the considerations which forbid such a defence in equity by a purchaser under a deed of trust, which mentions the judgment, and acknowledges the debt to be due.

The judgment remaining in full force, the question then is, how far it operates as a lien upon the real estate of the judgment debtor.

The writ of elegit given by the statute of Westm. 2, has always been in use in Virginia. Every person recovering any debt, damages, or costs, may sue out this writ to charge a moiety of all the lands and tenements whereof the debtor was seised at the day of obtaining the judgment, or at any time afterwards. 1 R. C. 525.

Some years before the judgment, Daniel Burton the father of Reuben Burton died intestate, leaving Sarah Burton, his widow, and the following children as his heirs, to wit: Thomas, a child by the said Sarah; and Susan, Mary, Reuben, Rebecca, and William,

by a former marriage. Rebecca afterwards died intestate, and unmarried, leaving her brothers and sisters as her heirs. As heirs of Daniel Burton, his two sons, Reuben and William, were each entitled to a sixth part of his real estate; and as heirs of Rebecca, they were each entitled to two-ninths of her real estate. Reuben Burton acquired, by purchase the whole interest of William, as heir of Daniel Burton, and also as heir of Rebecca; and in this way, his share of the real estate of Daniel Burton (taking into account the part of William and the part of Rebecca) was two-sixths and four-ninths of another sixth, being rather more than two-fifths.

By the terms of the agreement relied on in the defence, the heirs of Daniel Burton were to have during the widow's life the right of occupying, using, and working the coal pits, and also the right and power of sinking shafts and searching for coals on any part of the tract of land attached thereto, except the yard, houses, and gardens; and also the right and privilege of cutting and taking on any part of the tract, all necessary timber and wood for the use and management of the coal pits, opened, or to be opened, paying to the widow, during her life, a yearly sum of $200 for her dower interest. It has been objected that Reuben Burton's interest in this part of the subject could not be charged, because the subject was not exclusively his. This objection can present no difficulty. The judgment is clearly a lien upon a moiety of all the lands or tenements of which the debtor is seised. The estate in lands or tenements of a joint tenant, or tenant in common, is charged by judgment against such joint tenant, or tenant in common, as much as any other interest in real estate. It has long been so settled. In Viner's Abr. tit. Execution, let. N. pl. 25, vol. x. p. 549, it is laid down, that "if there are two joint tenants, and one makes a statute, and afterwards joins with his companion in a feoffment of the land, the moiety of the land may be extended upon this statute." As it may be extended upon a statute, it may likewise be extended upon a judgment. See Gilbert on Executions, 41, 42.

The question applicable to the tract generally, with the exception of the interest just mentioned, is, whether a judgment against a debtor who has a reversion in fee expectant upon an estate for life, creates a lien upon such reversion. It was upon this part of the case that the other side relied principally in the Court below.

We were told that a rent seck was not extendible; and from this it was attempted to deduce the conclusion, that a reversion after an estate for life (a dry reversion as it was called) could not be extended.

The case in which it was decided that a rent seck could not be extended, was that of Walsal vs. Heath, Cro. Eliz. 656. The action was replevin. The avowry was, that J. S. seised of lands for the life of Sibyl his wife in right of his wife, the reversion in fee to the baron; he and his feme made a lease for years, reserving £4 rent per annum. The baron being indebted by obligation made the

said Sibyl his wife, executrix. The debtor brings debt against her, by the name of Isabel, and recovered; and upon a writ of fieri facias a devastavit was returned, and thereupon an elegit awarded, and the sheriff returned that Isabel had £4 rent issuing out of that land, upon a demise made by her and her husband, and delivers the moiety of that rent, and thereupon he avows for the same, and it was thereupon demurred and adjudged ill for three causes. First, because a lease for years by baron and feme, without deed, is void against the feme. Secondly, the recovery against Isabel is void against Sibyl; and the sheriff cannot extend her land. Thirdly, the sheriff delivering the rent without land, so as there is not any reversion, it is but a rent seck; and a bare rent cannot be delivered, ut liberum tenementum.

This case does not at all go to show that a reversion in fee is not charged by a judgment.

It would be very remarkable if the judgment should create no lien upon a reversion, when such reversion is liable to a mere bond creditor of the ancestor. For it has long been adjudged that upon an obligation of the ancestor, binding himself and his heirs, the heir may be charged in respect to any estate of freehold which has descended upon him. A reversion in fee, expectant on a term of years, is regarded as assets in the hands of the heir; although the term be to continue five hundred years; as was the case in Smith vs. Angell, 2 Ld. Raym. 733. A reversion in fee expectant on an estate for life, is also assets; notwithstanding the life estate be still continuing. Rooke vs. Clealand, 1 Lutw. 303. 1 Ld. Raym. 53. Vin. Abr. tit. Execution, M. pl. 7. 15. If the party seised of the reversion, devise it for any other purpose than the payment of debts, the devise is void as to specialty creditors; and the creditor may maintain an action on the specialty against the devisees as well as the heirs, and charge them in respect to the reversion. Stat. of W. & M. enacted in Virginia in 1789; 1 R. C. 391, 392. And if any heir or devisee, so liable, shall before action brought alien the estate descended to him, he will be liable for the value of the land so aliened. Ibid.

The inquiry then presents itself, whether a creditor who has obtained a judgment against a debtor in his life time, is worse off, in respect to this matter, than a creditor by specialty merely.

In the case of Coke vs. Barnsley, Brownl. 234, where the question was, whether land held in ancient demesne was extendible, the judges held that it was: saying, "for otherwise, if it should not be extendible, there would be a failure of justice, which the law doth not allow of." There would be an equal failure of justice, if a reversion in fee were not liable to a judgment creditor. It is well settled that if a man lease for a year, rendering rent, the reversion may be extended upon an elegit during the lease; and the tenant by elegit shall have a moiety of the rent. Sir Thomas Campbell's case, 1 Rolle's Abr. 894, pl. 5. It is also settled, that if there be tenant

for life, the reversion in fee, and he in reversion acknowledges a statute, and then grants the reversion, and then tenant for life dies, this land shall be extended upon the statute. 2 Rolle's Abr. part 2, p. 473, let. Q. This proves that a statute creates a lien upon a reversion expectant upon an estate for life, though the life estate be still continuing.

The lien upon a reversion created by a judgment, is equal to that of a statute. It was so decided by Lord Hardwicke, in Gifford vs. Barber, 4 Vin. Abr. tit. Charge, letter A, pl. 17, p. 451. There the judgment debtor had a reversion after an estate tail. The estate tail having terminated, and the reversion coming into possession of the heir of the judgment debtor, the question was, whether the judgment created a lien upon it. The chancellor held that a person having an estate of inheritance subject to intermediate estates, might grant, charge, or encumber the reversion as he should see fit; and might encumber it by judgment as well as in any other manner.

The whole law upon the subject is laid down with great clearness in Gilbert on Executions, 38, 39. He says, "The judgment binds not only the lands and tenements of which the defendant is actually seised, but also the reversions on leases for lives as well as for years. For though the words of the elegit are, 'a moiety of all the lands and tenements of which the said A. was seized,' &c., yet the intent of the writ extends to whatever lands and tenements were actually vested in the defendant; because the statute is a moiety of the lands, which extends to reversions, which are comprised under the name of lands, since they are lands returning to the defendant when the particular estate ceases; and, therefore, though this was formerly disputed, the latter resolutions have settled the law to be as we have already mentioned."

The law is laid down in the same way by Sir Henry Gwillim, in a volume, which he prepared before his death, of the last edition of Bacon's Abridgment. See tit. Execution, let. C. vol. iii. p. 381, of Lond. ed. of 1832. And in the late case of Harris vs. Pugh, 4 Bing. 335, 13 Eng. Com. Law Rep. 459, it is expressly stated by the Court, that if the estate of the debtor in the reversion had been a legal instead of an equitable estate, the judgment would have bound it, and overreached the subsequent conveyance.

The judgment being a lien upon the property, that lien clearly operates against the alienees of the debtor. United States, vs. Morrison, &c. 4 Peters, 124. Watts vs. Kinney, &c. 3 Leigh, 272.

If there were any difficulty in taking the reversion of the debtor in execution at law, it would, upon the general principles of a Court of equity, still be bound in equity: and the lien enforced against the debtor's alienees. Coutts vs. Walker, 2 Leigh, 268.

In this case, the reason for enforcing the lien against the alienee is stronger than usual; for here, the property subject to the lien was purchased with full knowledge of the judgment, and knowledge also that the debt was still due.

The trustees in the deed of trust could, certainly, not object to the Court's decreeing a sale of the property subject to the lien. For they, by the terms of the deed of trust were to sell at all events. See Mutual Ass. Society vs. Stanard, &c. 4 Munf. 538. Neither can any one claiming under the trust make that objection. It might indeed have been seriously contended, upon the authority of the case just cited, that the decree should have been for the sale of the whole property, instead of a moiety merely. But such a decree would no doubt have been objected to on the other side, and the objection has been carefully avoided. The decree in this case merely directs a sale of the land, so far as the creditor has a lien upon it.

That equity will, at the suit of the creditor, after the death of the judgment debtor, accelerate the payment by directing a sale of the moiety; and not compel the judgment creditor to wait till he has been paid out of the rents and profits, was settled in Stileman vs. Ashdown, 2 Atk. 608, Amb. 13, and has been acted on in a great number of cases. Galton vs. Hancock, 2 Atk. 433. O'Gorman vs. Comyn, 2 Sch. & Lef. 137. O'Fallon vs. Dillon, ibid. 13. Countess of Warwick vs. Edwards, 1 Dick. 51. In Virginia the principle has been recognised in Blow vs. Maynard, 2 Leigh, 57. 66.

No portion of a debtor's real estate is exonerated from his creditors, or exempted from being sold, because it yields nothing annually.

In Robinson, &c. vs. Tong, 2 Str. 879. 3 P. Wms. 401, where the question related to an advowson which had descended upon the heir, to wit, a right of presentation to a church; and the objection was taken that it yielded nothing; it was answered that it might be made available by sale. Lord Hardwicke decided the same way in Westfaling vs. Westfaling, 3 Atk. 460. Not only was the advowson decided to be real assets, and directed to be sold; but it was decreed that the money should be paid to judgment creditors according to the priority of their judgments, and then equally to bond creditors. Tong, &c. vs. Robinson, 1 Brown's Par. Cas. p. 114 of Tomlin's edition.

In the case of a reversion, where it is impracticable to obtain a discharge of the debt by any application of rents and profits; and where the only way of making the reversion available in any reasonable time is by sale; there is every reason for decreeing a sale. This subject has been fully considered, and the propriety of a sale decided in Tyndale vs. Warre, Jacob's Reports, 212. 4 Cond. Eng. Ch. Rep. 100.

Mr. Justice BARBOUR delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court, for the fifth circuit, and eastern district of Virginia.

The case was this:

In the month of June, 1827, Smith and Kennedy obtained a judgment in the Circuit Court against Reuben Burton, for $1348 75, with interest from the 14th October, 1823, and costs. On this judg-

ment, an elegit was issued on the 31st of December, 1827. On the 12th of August, in the same year, Reuben Burton, by deed conveyed his real estate to certain trustees, in trust, to sell the same for the benefit of his creditors; amongst many other debts enumerated in the deed, the judgment already mentioned, recovered by Smith and Kennedy, was included.

These last mentioned creditors, the appellees, never assented to, or accepted any thing under the trust deed. Burton having died, the only trustee who accepted the trust, on the 21st of December, 1829, sold, under the deed, all the estate, both real and personal conveyed by it; and at that sale, Sarah Burton by her agent, purchased, at the price of $1000, the interest of Reuben Burton, that is, two-fifth parts in a certain tract of land called Springfield, supposed to contain about five hundred acres, and also his interest in certain coal pits on the same tract. The character of Reuben Burton's interest in the Springfield tract of land, as appears from the record, was that of a reversion in fee, after an estate for life. And the character of his interest in the coal pits, as appears from an agreement in the record, was this: The heirs of Daniel Burton, of whom Reuben was one, were to have, during the widow's life, the right of occupying, using, and working the coal pits, and the right and power of sinking shafts, and searching for coal on any part of the land, except the yard, &c.; paying to the widow, during her life, the yearly sum of $200, for her dower interest. The same agreement will show his interest in a mineral spring, also included in the decree.

After the death of Reuben Burton, the appellees, finding that there was no personal estate to satisfy their debt, in September, 1834, filed their bill, to enforce the lien created by their judgment; making, amongst others, Sarah Burton a defendant, as purchaser of the interest of Reuben Burton, before described, in the Springfield tract of land, and coal pits.

She answered, saying that the property conveyed to her was not purchased for her own benefit, but for the benefit of her son, Thomas O. Burton, the appellant. She insisted, in her answer, that the appellees had no right to enforce their judgment, as more than five years had elapsed since the death of Reuben Burton; she denied that the judgment created any lien on the property purchased by her which was valid against her; she insisted that the appellees were entitled to no relief in equity; and that at all events, a sale should not be decreed.

An amended bill was thereupon filed, making Thomas O. Burton a defendant. He filed an answer, insisting upon the grounds taken by Sarah Burton.

The cause coming on to be heard, the Court held the reversionary interest of Reuben Burton in the Springfield tract of land, and his interest in the right of occupying and working the coal pits thereon, and also his interest in the mineral spring thereon, with the twenty-five acres of land adjoining thereto, liable to the appellees' judgment;

and decreed a moiety of Reuben Burton's interest to be sold. From that decree this appeal is taken.

Upon this state of facts, two questions arise : 1st. Whether the judgment created a lien on the reversionary interest of Reuben Burton in the land, in question? And, 2d. Whether it was competent to the Court to decree a sale of his interest, with a view to accelerate the payment of the debt; or whether the appellees should have been left to such remedy as they had at law ?

As to the first point. In relation to lands of which the debtor has the actual seisin, there is no doubt but that the judgment creates a lien. Upon this subject, this Court said, in the case of the United States *vs.* Morrison and others, 4 Peters, 124, there is no statute in Virginia which expressly makes a judgment a lien upon the lands of the debtor. As in England, the lien is the consequence of a right to take out an elegit. During the existence of this right, the lien is universally acknowledged. That right unquestionably existed in this case; because an elegit did actually issue within the year after the judgment was rendered. There would then be no sort of difficulty upon the question of a lien, if the debtor had had actual seisin of the land; but the difficulty is suggested that his interest was reversionary only. Let us inquire whether this interposes any obstacle. All the authorities, ancient and modern, agree in this proposition that a reversion after an estate for life is assets; or as some of the books express it, quasi assets, in the hands of the heir, in regard to the bond of his ancestor, binding heirs; and that in such case, the plaintiff may take judgment of it, quando acciderit. Dyer, 373. Carthew, 129. 1 Lord Ray. 53. Chitty on Descents, 336. In Dyer, ubi supra, the form of the judgment in such case is given. It is, " that he should recover the debt and damages of the aforesaid reversion, to be levied when it shall fall in." And it is added, that a special writ shall issue to extend the whole. The doctrine upon this subject is laid down very clearly by the Master of the Rolls, in the case of Tyndale *vs.* Warre, 3 Jacob. 217, 218. There are, says he, three cases of reversions; if it be a reversion dependant upon a term of years, the law does not consider the term as any thing, and judgment is given against the heirs, if he plead reins per descent. But if the creditor take out an elegit, he is stopped by the term, which is a good defence for the lessee in ejectment, and so there is a cesset executio during the term. If it be a reversion after an estate for life, the heir must plead specially, stating that he has no assets except this, and setting forth what it is; the creditor may then take judgment quando acciderit. In the case of a reversion after an estate tail, the authorities say, that the heir may plead, generally, reins per descent, distinguishing this from the plea in the case of a reversion after an estate for life. The plaintiff may then reply, that there is this reversion descended to the defendant; and he may then have a judgment quando acciderit, the same as in the case of a reversion after an estate for life

Now, upon principle, it would seem to be clear, that whatever estate descended to the heir, which was liable as assets to the bond debt of the ancestor, must be bound by a judgment obtained against the ancestor in his lifetime.

But this is not left to rest upon deductions from general principles, or analogy to the case of assets descended to the heir. Whatever may be the doctrine as to reversions after estates tail, about which there has been some doubt, as appears from the case before cited, from Jacob's Reports; there is a current of authority going to prove that a reversion after an estate for life, is bound by a judgment against the ancestor from whom it immediately descends.

The statute of Virginia giving to a party the right, at his election, to have an elegit, is almost a transcript of the statute of Westminster the second. The writ itself commands the officer to deliver to the plaintiff a moiety of all the lands and tenements, whereof the debtor, at the time of obtaining the judgment was seised, or at any time afterwards.

Lands and tenements, then, are the subject on which the writ is to operate.

Now, in Comyn's Digest, title Grant, E. 2, it is said, that by grant of all lands and tenements, a reversion passes. In the same book, title Estate, B. 12, it is said: If a man grant the land itself the reversion passes. So in Moore's Reports, 36, a reversion is said to be a tenement. Thus it appears that a reversion falls within each of the terms, lands, and tenements. But the party must have been seised at the time of obtaining the judgment, or afterwards.

Now let us see what is meant by the seisin spoken of in the statute. And the authorities are clear that it is not confined to actual corporeal possession. In Gilbert on Executions, pages 38 and 39, it is said, that the judgment binds not only the lands and tenements of which the defendant is actually seised, but also the reversions on leases for lives, as well as for years; for although the words of the elegit are, that without delay you cause to be delivered a moiety of all the lands and tenements of which the aforesaid B. was seised; &c., yet the intent of the writ extends to whatever lands and tenements were actually vested in the defendant: because the statute is, a moiety of the land, which extends to reversions, which are comprised under the name lands, since they are lands returning to the defendant when the particular estate ceases.

So in 2 Williams' Saun. 68,f it is said: Judgment binds not only lands of which defendant is actually seised, but also reversions on leases for lives or years; and, therefore, a moiety of a reversion may be extended, and plaintiff will have a moiety of the rent. So in Chitty on Descents, 338, it is said, That if judgment be had in the debtor's lifetime, it will bind the property, though no execution be taken out till the property descends to others. Nay, in case of a judgment, it is said to bind, even where it is against a person from whom the estate does not immediately descend, as if it were against

a remainderman or reversioner; whereas, the contrary would be the case of a bond on which no judgment had been rendered in the debtor's lifetime, who stood in the same relation.

The author last cited, in page 54, quoting Watkins on Descents, 40, 41, speaking of the subject of seisin of reversions, remarks, that the confusion seems to have been created by the different meanings which have been attached to the word "seisin;" by being used in a general sense when it should properly have been confined in its acceptation; or by being confined when it should have been taken in a general sense. And in pages 53, 54, he thus sums up the doctrine. We must here remember that the expressions or terms of a seisin in law and a seisin in deed, refer only to the present and actual corporeal possession of the premises; and not to the fixture of an interest which is to come into actual enjoyment in some future event: and here the word "seisin" is used in its strict sense; and though we frequently use the term "seisin" of a remainder or reversion expectant upon a freehold, yet this signifies no more than that the property in them is fixed in the owner, and that such owner is placed in the tenancy. The particular estates, and those expectant upon them, form in law only one estate; and the delivery of possession to the person taking first extends to all. All therefore may be said to be seised, all being placed in the tenancy, and the property being thus fixed in all. It is upon these principles that the authorities lay down the doctrine, that a judgment binds a reversion after an estate for life.

We are therefore satisfied that the judgment of the appellees bound the reversionary interest in the land in question; and as to the other property embraced in the decree, there is no room for doubt or difficulty. And then the question is, whether the Court ought to have decreed a sale, with a view to accelerate the payment of the debt; or whether the appellees should have been left to such remedy as they had at law? Upon the subject of the power of a Court of equity in this respect, the authorities are decisive. More than a century ago, in the case of Robinson vs. Tong, 3 Viner's Abr. Assets A, pl. 28, p. 145, an advowson was decreed to be sold, at the instance of creditors, as assets descended; and the decree was affirmed in the House of Lords. That is supposed to have been the case not of judgment, but bond creditors. In Stileman vs. Ashdown, 2 Atk. 607, Lord Hardwicke decreed a sale of a moiety of the land to satisfy a judgment creditor. He confined the decree to a moiety, because the judgment only bound a moiety at law. On that occasion he said, that whilst equity could not change the rights of the parties, it might accelerate the payment by directing the sale of a moiety, and not let the creditor wait until he was paid out of the rents and profits. The principle was asserted by Lord Redesdale in 2 Sch. and Lef. 138, and in the same book, 13; and such he stated to be the settled doctrine in Ireland. In the first of these cases he said : "Although this Court has been in the habit of selling to pay judgment debts, where it was ascertained that they were legal

liens on the land, the foundation of that was the legal right. The only equity the creditor had, was to render his remedy more effectual by getting a sale, instead of levying his debt out of rents and profits, which was the only execution the common law gave.

These cases are cited and relied upon, and the doctrine of them approved, in 2 Leigh, 30; and in page 58 of that volume, Judge Green says: "This principle, so far as I am informed, has been uniformly practised on in Virginia, in the cases of heirs bound by the obligations of their ancestors. And although I cannot see clearly the foundation of this equity to sell, where the law only authorizes an extent, or a personal judgment, or decree against the heir for the value of the assets descended, whether aliened by him or not, (see the statute of fraudulent devises;) yet I think we are bound by the practice founded on these precedents, so long acquiesced in." In 6 Leigh, 196, which was a suit in equity brought by creditors to marshal assets, the same authorities were again cited with approbation, and the same doctrine reasserted by the judges, in their reasoning upon the case. In pages 219, 220, of this latter case, Judge Carr went into a review of English cases, which he said seemed to him to establish beyond question, the regular and long established course there, of selling the lands of deceased persons to pay their debts, binding the land, or to marshal their assets: and he added, that it struck him as a novelty when, in the course of the argument of the case, he heard a doubt suggested of the power of the Court to decree a sale in such cases. In the case of Tyndale vs. Warre, 3 Jacob, 212, this subject was extensively considered by Sir Thomas Plumer, Master of the Rolls; who held, in that case, a reversion expectant upon an estate for life, and even upon estates tail, limited to unborn children, to be assets for the payment of specialty debts; and accordingly he decreed it to be sold for that purpose. This last has a peculiar analogy to, and bearing upon the case before us; because it sustains in the fullest and most decisive manner both the grounds on which the decree of the Circuit Court rests: that is, it proves first, that a reversion after an estate for life, or even after estates tail limited to unborn children, is assets, liable to the specialty debt, and, of necessary consequence, to the judgment of the ancestor from whom it immediately descends; and, secondly, that a Court of equity will decree such a reversion to be sold, in order to accelerate the payment of the debt. The liability of a reversion after a life estate to be sold, was at once conceded by the counsel for the heir: their effort was to maintain that the reversion in that case could not be sold, because it was after an estate tail. It was strongly said by the Master of the Rolls in that case, that the reversion was a part of the real estate of the ancestor; and according to all general principles, every part of the real estate of the debtor, except copyhold, is considered as applicable to the payment of his specialty debts. There is another part of the reasoning of the Master of the Rolls, which has a most cogent application to this. It having being urged that a sale ought not to be decreed, out of consideration to the heir, that a higher price might be ob-

[Burton *vs.* Smith et al.]

tained; he said: "But I think that such considerations ought not to weigh, for the question is, to whom does the property belong? It is not the habit of the Court to consider the interest of the heir, when opposed to that of the creditors. They ought to have the fullest remedy. And upon what principle can the Court refuse to give them the benefit of a sale, because another person, whose interest is secondary, and entirely subject to theirs, may be benefited by delay?" So far from its being proper for a Court to hesitate about decreeing the sale of an interest because it is reversionary, we think that the character of the interest affords a stronger reason. For in regard to property in present actual possession, the elegit, although a tardy remedy in its operations, yet is in some degree an effective remedy; inasmuch as the creditor will by that means annually receive something towards his debt: whereas in the case of a dry reversion, as the one in the present case is, if the outstanding life estate should continue during half a century, the creditor might look on in hopeless despondency, without the possibility of receiving one cent from that source, except through the interposition of a Court of equity, in decreeing a sale. Now if the acceleration of a tardy remedy be cause enough to justify the helping hand of equity, a fortiori, it ought to be extended to him who during the life of the tenant for life is without any remedy at all. As to the objection, that the judgment did not bind the land in the hands of the appellant because he was a purchaser, we consider it wholly untenable. We have already said that the judgment created a lien: now it is of the very nature and essence of a lien, that no matter into whose hands the property goes, it passes cum onere; if this were not the case it would cease to be a lien. If this proposition stood in need of authority to support it, we find it abundantly in the case of The United States *vs.* Morrison and others, 4 Peters, 124. In that case the judgment of the United States rendered in 1822, was held to overreach several deeds of trust executed in 1823; although the United States having issued a fieri facias, whilst that execution was in the marshal's hands, the agent of the treasury at the instance of the defendants, instructed the marshal to forbear levying it on condition of the defendants' paying the costs; and accordingly the marshal did not make a levy, but made a return within the year 1822, that all further proceedings were suspended in pursuance of said instructions; and that suspension was continued until the year 1825.

A very strong application of this doctrine was made in the case of the Mutual Assurance Society *vs.* Stanard et al., 4 Munf. 539. In that case a deed of trust, bearing date 28th April, 1808, was held to be overreached by a judgment rendered on the 6th of May; the Court applying the legal fiction, that the judgment in contemplation of law related back to the commencement of the term, which was before the execution of the deed.

A still stronger application of the doctrine was made by the same Court, in the case of Coutts *vs.* Walker, 2 Leigh, 268. In that case the Court held, that a judgment creditor had a lien in equity upon

the equitable estate of the debtor, in like manner as he had a lien in law upon his legal estate; and a deed of trust having been executed by the debtor conveying his equitable estate to a trustee, and that too for the benefit of creditors between the commencement of the term, and the day on which the judgment was obtained; the same relation of the judgments to the first day of the term, as in the case previously cited, was held to exist; and thus the trust deed was overreached by the judgment.

It is argued that the judgment in this case was barred by the act of limitations of Virginia. That act provides, that no action of debt shall be brought against any executor or administrator upon a judgment obtained against his testator, or intestate, nor shall any scire facias be issued against any executor, or administrator, to revive such judgment, after the expiration of five years, from the qualification of his executor, or administrator. The facts in the record furnish a decisive answer to this argument. It appears from them, that the administration on Reuben Burton's estate was granted on the 9th of December, 1829; and this suit was brought on the 15th of September, 1834. So that five years had not elapsed from the time of the qualification of the administrator.

This view renders it unnecessary to examine whether the appellees would not have been within the saving of the statute, as contended for by their counsel.

Furthermore, it is objected that there should have been an account taken of the administration of Reuben Burton's personal estate. Without stopping to inquire whether that would be necessary in any case, where the suit is brought merely to enforce a legal lien; it is a sufficient answer to this objection to say—that there is undant evidence in the record, that there was no personal estate: nothing, therefore, could have been more unnecessary or unprofitable than to have ordered an account to be taken.

The last objection is, that an account should have been ordered of the rents and profits of the coal property.

Here, too, the record furnishes a satisfactory answer. Assuming, for the purpose of meeting this objection, that by analogy to the case of marshaling assets, a Court of equity would not decree a sale of real estate to satisfy a judgment where the rents and profits would discharge it in a reasonable time, as was held by the Court in the case of Tennent's heirs vs. Patton, 2 Leigh, 196; yet the facts of this case utterly repel the application of that principle to it. In that case, it will be seen that the debts of the ancestor were said by one of the judges to amount to $820, and the annual value of the land was ascertained to be $400.

In that case, therefore, the debt would be satisfied by the rents and profits in a short time. In this case the facts are these. There was an outstanding life estate in all the Springfield tract of land, except the coal pits and the mineral spring. Reuben Burton s interest in the coal pits was two-fifths, in the privilege of working them during the lifetime of the tenant for life; she receiving annually two

hundred dollars for the whole. Reuben Burton's real interest, then, is only two-fifths of any surplus which might remain, after deducting two-fifths of the annual rent to be paid. But the parties themselves seem to have considered $200 per annum, as the full value of the whole privilege of working them. If the agreement of the parties were to be taken as the standard of the annual value, his interest would really be worth nothing; because he would have to pay precisely the same proportion of the rent which he received of the profits; and it must be assumed, that they were worth more than the parties fixed as the value, in order to make any surplus at all. But, at all events, there is nothing in the case to justify the belief that there would be any surplus that would discharge the judgment in a reasonable time, or even in a long time: for, at the date of the decree, the whole debt, including principal, interest, and costs, amounted to about $2,500; and the principal being $1,348 75 cents, there would be an annually accruing interest of about $80, besides the annual payment of two-fifths of the $200 for rent, which would be $80 more. Thus it will appear that his interest of two-fifths must produce $160 annually, in order even to prevent the debt from being increased. To allow $160 for his two-fifths would require that the whole should be worth annually $400, which is precisely double the sum at which the parties fixed the rent.

This then seems to us to be, emphatically, a case in which the established principles of equity justify the sale of the property, with a view to accelerate the payment of a debt due to a judgment creditor.

In every respect in which we have viewed the case, we think that the decree of the Circuit Court is correct; and it is therefore affirmed, with costs.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the eastern district of Virginia, and was argued by counsel. On consideration whereof, it is adjudged and decreed by this Court that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed with costs.