By the Court—Hoffman, J.
It is admitted that the only question before us on this appeal is, whether a complaint filed by a creditor who has obtained a judgment against his debtor, for the purpose of setting aside a conveyance as fraudulent, must not allege an execution issued and returned, or at least that an execution has issued.
The case of The North American Company v. Graham, (5 Sandf., S. C. R., 197,) is an authority which ought apparently to dispense with any examination of the present case, and to call upon us to rest the decision of this appeal upon that alone. It has been commented upon with industry and ability, and its correctness disputed upon many grounds, of more or less weight. In my opinion, it can be supported, as the true exposition of the law; and we are at liberty and may be usefully employed in sustaining its authority.
Before - the statute of 13 Edward I, cap. T8, the lands of a debtor could not be reached in any mode for obtaining satisfaction of the debt, except, 1st, in a case involving the King’s prerogative, and 2d, against the heir on a lien created by his ancestor, such as a statute, staple, &c. This, Lord Coke observes, seems strange; custom and usage had so far encroached on the common law. (Harbert's case, 3 R., p. 12.)
The levari facias was, as far as I can understand, used only in three cases. The first was upon the process of outlawry, when after the capias utlagatum there could issue a venditioni exponas to sell the goods; a scire facias to collect the debts; and a levari facias to levy the issues and profits of the land. (Watson on Office and Duty of Sheriffs, pp., 160, 161, 163; Law Library, vol. 7, p. 115, &c.)
The second was upon a recognizance binding lands being forfeited. (Tenny de la Ley, 479; Fitzherbert Natura Brevium, fol. 265, D.)
*488 The rents and profits were alone taken. Possession was not delivered, and the third ease was of proceedings against clerics.
The statute of 13 Edward I, cap. 18, provided as follows: “When debt is recovered or knowledged in the King’s Court, or damages awarded, it shall be from henceforth in the election of him that sueth for such debt or damages to have a writ of fieri facias unto the Sheriff for to levy the debt of the lands and goods; or that the Sheriff shall deliver to him all the chattels of the debtor (saving only his oxen and beasts of his plough) and the one-half of his land, until the debt be levied upon a reasonable price or extent. And if he be put out of that tenement, he shall recover by a writ of novel disseisin, and after by,a writ of redisseisin if need be.” (Statutes at large, vol. 1, p. 93.)
The form of the elegit was this: commanding the Sheriff “that of all the goods and chattels of the defendant in his bailiwick (except his oxen and beasts of the plough) and also a moiety of the lands and tenements in the Sheriff’s bailiwick, of which the defendant, on the day the judgment was obtained or at any time afterwards, was seized, he should cause without delay to be delivered to the plaintiff, by reasonable price and extent, to hold the said goods and chattels as his own proper goods and chattels, and to hold the moiety of the said lands and tenements, as his freehold, .to him and his assigns, according to the form of the statute, until the debt and damages should be thereof'levied.” (Brownlow’s Brevia Judiciala, p. 77; Watson, Office, &c., of Sheriff, p. 207; Law Library, vol. 7, p. 149; Moyles Book of Entries, 37; Curzon’s Law of Executions, 150.)
Some points of moment were well established under this statute. First, all the goods were delivered at a price found by a jury in a manner which was afterwards prescribed. The goods were not sold as upon a fi. fa. Second, the word “price” was referred to the goods, and the word “extent” to the lands. Each was to be appraised through a jury. The goods were delivered at such appraisement, and the moiety of the lands, at the annual value so found. Third, if the chattels taken were sufficient to satisfy the debt, the Sheriff was not to extend the land. (2 Inst., 395.) Fourth, we see that the form of the writ imports that the judgment had at least this effect, that when the elegit *489 was sued out, the land owned at the day of obtaining the judgment could be delivered.
The statute of 29 Car. II, cap. 3, § 10, was intended to enable a judgment creditor to reach the land of a cestui que trust. It was adopted in our former statute. (1 R. L. of 1813, p. 74.) But it was that the land could be reached where a party was seized in trust for the debtor at the time of the execution sued. This was held to refer to the seisin of the trustee, and therefore where he had conveyed with assent of the cestui que trust before execution, though after judgment, the land could not be taken. (Hunt v. Coles, Comyn R., 226.)
It was a fixed principle of the law, that a judgment operated by relation as of the first day of the term in which it was obtained. “If judgment for debt or damages was given in banco upon a trial at nisi prius, the plaintiff shall have execution of the land which the defendant had at the day of the nisi prius, for this and the day in banco are but one day in law.” (Dyer’s R., 149.)
“ So he shall have execution of the land the day the inquest is taken; but he shall not have execution of the lands that the party had on the day of the writ purchased.” (Year Book, 29 Ed. III, 27.) Again, “if a man recover debt, he may sue execution of any land the party had at the time of the judgment, though he had aliened it before execution. So of any land that he had purchased after the judgment, although he had aliened it before execution.” (Year Book, 30 Ed. III, 24.)
The statute of 29 Car. II, cap. 3, §§ 13, 14, 15, (Statutes at large, vol. 3, p. 386,) has this remarkable preamble: “ And whereas it hath been found mischievous that judgments in the King’s Courts at Westminster do many times relate to the first day of the term whereof they are entered, or to the day of the return of the original, or filing the bail, and bind the defendant’s lands from that time, although in truth they were acknowledged or suffered and signed in the vacation time, after the said term, whereby many times purchasers find themselves aggrieved.” Then the act directed the day of signing to be entered on the margent of the roll, and the paper book or record signed by the Judge. They were to be judgments from that time, and not from the first day of the term as to purchasers. (See also the Statute 4, 5, William and Mary, cap. 20, 3 Statutes at large, 526.)
*490 It was held under the statute of elegit that if there were goods and chattels to the value of the debt, the land should not be extended. (45 Ed. III, 22, b; 2 Inst., 59, 395.) We are to notice that under the first clause of the elegit, whatever goods and chattels could be taken upon the old writ of fieri facias might be taken under the elegit. (Watson on Sheriffs, 207.)
In Virginia the statute giving any right to lands under a judgment is almost a transcript of the statute of Westminster, the second. 13 Edw. I. (Burton v. Smith, 13 Peters R., 480.) And Chief Justice Marshall, in The United Statesv. Morrison, (4 Peters, 124,) says: “ There is no statute in Virginia which, in express terms, makes a judgment a lien upon the lands of the debtor. As in England, the lien is the consequence of a right to take out an elegit. During the existence of this right, the lien is universally acknowledged.”
In that case the point decided was, that the right to take out an elegit was not suspended by suing out a fieri facias, and, consequently, that the lien of the judgment continued pending the proceedings on that writ. The decision proceeded upon that of the Court of Appeals in Virginia, which, no doubt, was the case of Coleman v. Cook. (6 Randolph’s R., 618.)
In the last case, writs of fi. fa. had been issued. The Sheriff had made some part of the judgment creditor’s debt upon them, and had not returned nulla bona as to the rest of the demand. Ho other execution had been taken out. The bill in Chancery to reach property was sustained.
In Burton v. Smith, (13 Peters, 464,) a case arising in Virginia, a judgment was obtained and an elegit issued upon it. The judgment was had in June, 1827, the elegit issued in October, and a deed, under which the questions arose, was made in August of the same year. The question was, whether a reversion expectant on an estate for life was bound, and could be reached in a Court of Chancery and be sold under its decree. The Court say: “In relation to lands of which the debtor has the actual seisin, there is no doubt but that the judgment creates a lien.” The language in The United States v. Morrison, (supra,) is then quoted; and, after examining authorities, the Court proceed: “We are, therefore, satisfied that the judgment of the appellees bound the reversionary interest in the land in question.” The contest was between *491 the judgment creditors and a purchaser under the deed of August.
In The Bank of the United States v. Winston, (2 Brock., 252,) Chief Justice Marshall says: “ The lien depends on the right to sue out an elegit'' In Massingill v. Downs, (7 How. U. S. R., 760-768,) it is observed: “ The lien, if not an effect of the judgment, is inseparably connected with it. And this is the case whether the lien was created by the judgment and execution or by statute.”
In Coutts v. Walker, (2 Leigh’s R., 268,) Walker recovered judgments against Patrick Coutts, son of Reuben Coutts, on the 2d of March, 1821, and sued out executions thereupon. Two deeds were executed by Patrick between the first day of the term and the day of the actual rendition of the judgment. These deeds were alleged to be fraudulent. No proof of this was given; but the question arose, whether a certain equitable interest of the judgment debtor, which was in him on the first day of the term, could not be reached by a bill in Chancery of the creditor. It was held that this could be done. Two points were declared: 1st. A judgment creditor obtains a lien in equity on an equitable estate, as he acquires a lien at law on a legal estate; 2d. Judgments related to the first day of the term in which they were rendered, except, in England, as to purchasers under 29 Car. II, ch. 3, § 14. That act was not part of the law of Virginia.
It deserves notice that the most accurate English writers speak of the judgment forming a lien upon, or binding, the lands.
Thus, Baron Gilbert, (on Executions, p. 38,) says: “The judgment binds, not only the lands and tenements of which the defendant is -actually seised, but also the reversions on leases for lives, as well as for years.”
So in 2d Wm. Saunders, 68: “Judgments bind, not only lands of which the defendant is actually seised, but also reversions; and, therefore, a moiety of a reversion may be extended.”
Watkins on Descents, (p. 40,) uses similar language: “It is upon these principles that the authorities lay down the doctrine that a judgment binds a reversion after an estate for life.”
These expressions of elementary writers are referred to, by BARBOUR, J., in the case of Burton v. Smith, above cited.
*492 ' Mr. Bingham, (on Judgments and Executions, law library, vol. 13, p. 40,) says: “ As against the defendant and his heirs, the judgment binds a moiety of all the freehold lands and tenements which he, or any person in trust for him, were seised of at or after the time to which the judgment relates.”
So, Chancellor Walworth, after noticing that the Statute of Westminster does not, in terms, create a lien so as to prevent a sale before execution, observes that the. uniform construction of the statute has been to give such a lien upon all lands which could be reached by the process of the Court, from the entry of the judgment. (Manhattan Co. v. Evertson, 6 Paige, 457-467.)
It deserves notice, also, that the judgments of the United States Courts become liens solely by force of the process act of 1792 and 1789, making the forms of writs and executions the same as those used, in the Supreme Courts of the respective States. Where the execution can take real estate held at the time of the judgment, the lien prevails. (Konig v. Bayard, 1 Paine & Duer’s Pr., 289; Manhattan Co. v. Evertson, supra; Tayloe v. Thompson; 5 Peters’ R., 358.) The line, of reasoning of Mr. Justice Thompson in Konig v. Bayard is quite pertinent to the present question.
It seems to me quite illogical, and inconsistent with the form of- the writ.and the admitted operation of the statute, to say that the elegit created the lien on lands. If it did, the lien could not have existed, before the .writ issued, and the statute could not have warranted the taking of lands aliened after the judgment, and before the ehgit was issued.
'On the other side, the statute did not, in express words; declare the judgment a lien, as has been done in statutes in many of our States—for example, in our old act of 1813. It may, then, not be logical and precise to say that the judgment created the lien.
Yet the statute does, practically and substantively, amount to this. The judgment shall operate to give to the judgment creditor a power to take lands held at its date, whenever he shall take out a writ of elegit to enforce such power. This is a right to take the moiety of the land. What is this but a right to do something with- the land?—to subject it to payment of his demand? The general use of language authorizes us to call this a lien.
*493 These views aid in the estimation of the authority of Neate v. The Duke of Marlborough. (3 Mylne & Craig, 407.) As a decision it is explicit that an elegit must be issued, although it need not be returned. It is shown that the case of Manningham v. Lord Bolinbroke was a case of a demurrer overruled, because it was not necessary to state the return of the writ, although it was so as to its having been issued.
The language of Lord Cottenham imports merely that the judgment per se gives no title to the land, and therefore does not authorize an application to the Court of Equity. It is the act of Parliament which gives the legal title upon taking out the writ— that legal title or right being to bring ejectment. If obstructed in this, the Court gives its aid. In other words, it is not because there was nothing of lien, but because the creditor had not asserted such lien by the usual process—in truth, had not shown a remedy at law ineffectual.
The view, which I consider as entirely satisfactory upon this point, is this: I have before shown that it was an ancient ‘rule, that if there were goods and chattels sufficient to pay the debt, lands should not be extended. The elegit comprised in one writ the direction to make the debt out of goods and chattels, and out of a moiety of the lands. The construction and rule which required that the goods should be first resorted to, has been adopted in terms in all the executions known in our State since the year 1787.
Thus, in the law of the 19th of March of that year, (1 Greenl., 407,) section 7, the execution to be issued against lands and tenements is to command the Sheriff that of the goods and chattels he make the debt, &c., and if sufficient goods and chattels cannot be found, then he cause the debt to be made of the lands, &c. Section 9 of the revised act of 1813, (1 R. L., 502,) is exactly to the same effect. The provision of the Revised Statutes of 1830 is substantially the same. (2 R. S., 367, § 24.) And the Code is, •that if the execution is against the property of the judgment debtor, it shall require the officer to satisfy the judgment out of the personal property, and if sufficient personal property cannot be found, out of the real property belonging to the debtor on the day when the judgment was docketed.
*494 In all this there is the plain principle found that personal property is the primary fund for payment of the judgment debt, and an execution to reach such property is the regular and known method of ascertaining whether it exists or not. It is presumed that the Sheriff does his duty and will levy upon personal property if it can be found; but to raise this presumption the writ must, of course, be in his hands.
This line of reasoning tends to support the right to file such a bill as the present, after execution issued, and before its return, upon allegations of.the inability of the Sheriff to find personal property, and of the interposition of the fraudulent transfer of real estate; and for this we shall find considerable authority in the cases hereafter mentioned.
It is insisted by the defendants’ counsel that no case can be found distinctly holding that a fraudulent transfer of real estate may be set aside without an execution issued.
The following are the leading authorities in our Courts connected with a fraudulent conveyance of real estate:
In Brinckerhoff v. Brown, (4 Johns. Ch. R., 671,) there is nothing but the general language of Chancellor Kent, which the counsel has referred to, which tends to support the proposition that an execution is not necessary. The property in question was personal. No execution bad been taken out, nor judgment recovered, when the bill was filed, but a judgment was obtained during the pendency of the suit. The case offered no ground as to real estate, as the legal remedy was plain and open. In Hendricks v. Robinson, (2 Johns. Ch. R., 286,) the bill was by a judgment creditor, and after execution issued. It was to set aside conveyances of real estate, as well as transfers of personal property. The Chancellor held that the conveyances of the real estate were void, and should be declared fraudulent. The bill was filed in June, 1809. The execution had been issued on the 6th of February, 1809, upon judgments recovered in the month of January, 1808. The conveyances were made in March, 1808. There is nothing to show that the executions had been returned; but there was an allegation in the bill, after the statement of the issuing of the executions, that by reason of the said fraudulent transfers (above stated) the plaintiff could obtain no satisfaction of his judgments. This case, then, involves the proposition, *495 that after execution on a judgment a transfer of real estate may be set aside in equity. It involves also, as I think, the proposition that such execution need not be returned. It tends to negative the proposition that a judgment without execution is sufficient. And when the language of Chancellor Kent is considered, (see p. 296,) used when he is treating of the transfer of the real estate, we are almost authorized to say that he -deemed the issuing of an execution essential.
In Brinckerhoff v. Brown, (6 Johns. Ch. R., 139,) the executions of all the co-plaintiffs, (judgment creditors,) had been returned. The bill was to reach many things besides real property.
The decisions of Chancellor Walworth, upon questions of fraudulent conveyances and transfers, are very numerous. I select that of King v. Wilcox, (11 Paige, 589,) as pertinent to the present inquiry. The complainants had obtained a judgment, and had issued an execution. It is not stated that the execution had been returned, only that Wilcox had no property on which the execution could be levied, except the premises specified in the deed assailed. It was real estate conveyed, and me conveyance was set aside.
The Bank of Orange County v. Fink, (7 Paige, 87,) was a case of an execution taken out, and real estate alone in question. In The Bank of the United States v. Housman, (6 Paige, 527,) the executions had been returned.
It is true that in Clarkson v. Depeyster, (3 Paige, 320,) the Chancellor does say: “That for the purpose of obtaining the rehef sought it was not necessary for the judgment creditor even to sue out execution; that he might have filed his bill in respect of the lien, and to clear the real estate from an incumbrance improperly or fraudulently interposed at any time after the docketing of his judgment.” Yet, in the case, the judgment creditor had issued and had an execution returned, and the creditor by decree had the execution in the hands of the Sheriff. The-latter was a lien from the time of issuing the execution.
The Chancellor refers to 1 Paige, 305, and 4 Johns. Ch. R., 677. The former case (Beck v. Burdett) cannot give support to the proposition; I think its language is hostile to it. The other case (Brinckerhoff v. Brown) does not sustain it.
*496 In The Mohawk Bank v. Atwater, (2 Paige, 54,) the complainants had taken out executions on their judgments, under which a sale had been made, and they had purchased the property. They then filed a bill to set aside fraudulent conveyances. The Chancellor does indeed repeat the proposition stated by him in Clarkson v. Depeyster.
With the exception of these dicta of the very learned Chancellors I have mentioned, and the dictum of Assistant Vice-Chancellor Sandfobd in Storm v. Waddell, (2 Sandf. Ch. R. 510,) there is not, I believe, to be found the least authority warranting the proposition that an execution need not be issued, down to the period of the close of the Court of Chancery in our State.
I have gone over numerous cases decided since that time. In the following a conveyance of real estate comes in question, generally connected with transfers of personalty: Nicholson v. Leavitt, (4 Sandf. S. C. R., 253; 2 Seld., 510,) The Chautauque Bank v. White, (2 Seld., 236,) Brigham v. Tillinghast, (3 Kern., 215,) Collomb v. Caldwell, (16 N. Y. R., 484,) Barney v. Griffin, (2 Comst., 365,) a case limited to real estate, and of a bill after execution returned unsatisfied; Crippen v. Hudson, (3 Kern., 161,) Greenwood v. Brodhead, (8 Barb., 593,) Bishop v. Halsey, (3 Abb., 400,) Wilson v. Forsyth, (24 Barb., 105.) There is nothing in either of these cases that approaches to a decision of the point contended for by the plaintiff’s counsel. There are a few general expressions scattered through the opinions in its favor, and nothing more.
My conclusion is, that the North American Company v. Graham is not affected by any decisive authority, previous or subsequent, nor by any sound line of legal reasoning; that it announces the true rule; and that the judgment in the present case must be affirmed.
Judgment affirmed., with costs.