UNITED STATES of America, Appellant,

v.

Fred A. AVILA; Molly Avila; Security Pacific National Trust Co.; James D. Diemer; Julia Diemer; Citizens First National Bank of New Jersey; Frances Sylvester.

Frances SYLVESTER, Defendant/Third–Party Plaintiff,

v.

TICOR TITLE INSURANCE COMPANY; Chicago Title Insurance Company, Third–Party Defendants.

No. 95–5526.

United States Court of Appeals, Third Circuit.

Argued May 9, 1996.

Decided July 1, 1996.

Marion E.M. Erickson (argued), Gary R. Allen, William S. Estabrook, Richard Farber, United States Department of Justice, Tax Division, Washington, DC, for Appellant.

Donald L. Berlin (argued), Berlin, Kaplan, Dembling & Burke, Morristown, NJ, for Appellees Fred A. Avila, Molly Avila, Security Pacific National Trust Company, James D. Diemer, Julia Diemer, and Citizens First National Bank of New Jersey.

Frederick L. Bernstein, Hackensack, NJ, for Frances Sylvester.

Before: GREENBERG, ALITO, and McKEE, Circuit Judges.

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

In this case we must determine whether the government's tax lien in real property is limited to a taxpayer's equity when he conveyed the property subject to the lien or whether the lien also attaches to the appreciation in the value of the property after the conveyance. Since nothing in the relevant statutes suggests that the government lien should be limited to the value of the taxpayer's equity in the property at the time of the conveyance and since the conveyance cannot affect the lien, we will reverse the district court's order based on its contrary conclusion. In addition, we find that determination of the property interest to which the lien attaches will depend on the relative longevities of Herbert and Frances Sylvester, who were the married owners of the property when the lien attached, and that James D. Diemer and Julia Diemer, the second purchasers of the property subject to the lien, properly can claim the benefits of equitable subrogation to encumbrances against the property with priority over the government lien.

## A. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The germane facts are not disputed. On November 5, 1979, the Internal Revenue Service made an assessment against Herbert Sylvester (but not against Frances Sylvester) in the amount of $62,523.21 pursuant to 26 U.S.C. § 6672. App. 14. Mr. Sylvester did not pay the assessment so a tax lien arose pursuant to 26 U.S.C. § 6321 and attached to all his property, including his interest in the real property involved in this case located at 500 Ridgeland Terrace, Leonia, Bergen County, New Jersey, which he and his wife owned as tenants by the entireties. App. 13–14. On June 26, 1980, the Internal Revenue Service filed a Notice of Federal Tax Lien against Mr. Sylvester (but not against Mrs. Sylvester) in Bergen County, New Jersey, for the above liability. App. 14.

Mr. Sylvester did not satisfy the lien in whole or in part. Rather, he divested himself of any interest in the property on October 3, 1980, when he conveyed it to Mrs. Sylvester for less than $100. App. 15. At that time, the property was worth $155,000 but was encumbered by liens with priority over the federal tax lien in the total amount of $154,318. These liens were: (1) mortgages held by Midlantic National Bank in the total amount of $100,566.26; (2) a mortgage held by Daniel Segal in the amount of $12,-000; (3) a judgment in favor of Howard Strauss against Mr. Sylvester in the amount of $15,000; and (4) a judgment in favor of United Jersey Bank against Mr. Sylvester in the amount of $26,751.74. App. 104–05. The Internal Revenue Service refiled its lien on June 4, 1985.

On December 19, 1986, the Sylvesters were divorced, and Mrs. Sylvester took the property under the terms of their property settlement agreement. The agreement required Mrs. Sylvester to sell the property and to pay the balance due on various liens against the property, including the federal tax lien, from the proceeds of the sale.[1]

On April 18, 1989, Mrs. Sylvester sold the property for $580,000 to Fred Avila and Molly Avila who secured title insurance through Ticor Title Insurance Company. Ticor was aware of the IRS lien, but omitted it from its list of exceptions to title in the mistaken belief that the 1980 lien had expired and that the refiled 1985 lien was a new lien that had arisen after Mr. Sylvester no longer had an interest in the property. Thus, notwithstanding the settlement agreement, Mrs. Sylvester did not pay off the federal tax lien with the proceeds of the sale.

1. The liens listed in the settlement agreement included the four instruments listed above with the change that Howard Strauss was listed in the agreement as holding a mortgage rather than a judgment. The parties have not noted this distinction in their briefs. Apparently, they regard the difference between a judgment and a mortgage as inconsequential and thus we do not consider the change from a judgment to a mortgage any further. In addition, a judgment for about $7,500 in favor of General Electric against Herbert Sylvester was listed in the agreement. The parties did not stipulate that this judgment had priority over the tax lien so we are not concerned with it.

On December 27, 1991, the United States filed a complaint in the district court against the Avilas and Security Pacific National Trust Company, their mortgagee, seeking to foreclose the tax lien on the property. App. 7–11. On January 29, 1993, the Avilas sold the property to James D. Diemer and Julia Diemer for $480,000, following which, on November 3, 1993, the United States filed an amended complaint joining the Diemers and their mortgagee, Citizens First National Bank of New Jersey, as foreclosure defendants. The government also sued Mrs. Sylvester for damages in the amended complaint asserting that it was a third-party beneficiary of her settlement agreement with her husband and that she had breached her duty under the agreement to pay the debt secured by its lien that Mr. Sylvester owed to it.

On February 2, 1994, the Diemers filed a motion for partial summary judgment. They argued that the IRS lien attached to Mr. Sylvester's undivided one-half interest in the property subject to his wife's right to survivorship, and that the government's interest in the property never could exceed such an interest. They further argued that they were entitled to be equitably subrogated to the liens with priority over the IRS lien that were satisfied when the Avilas acquired the property and to that extent had a priority over the government lien. On or about February 25, 1994, the United States filed a motion for partial summary judgment, arguing that Mrs. Sylvester's sale of the property to the Avilas had destroyed the right of survivorship and that the IRS lien therefore was attached to a one-half interest in the property unencumbered by Mrs. Sylvester's right of survivorship.

On August 1, 1994, the district court denied the United States' motion for partial summary judgment and granted the Diemers' and Citizens First National Bank of New Jersey's motion for partial summary judgment. *United States v. Diemer,* 859 F.Supp. 126 (D.N.J.1994). The court held that the IRS lien attached only to Mr. Sylvester's undivided one-half interest in the property and that the value of the lien was fixed at the time Mr. Sylvester transferred his interest to his wife on October 3, 1980. Thus, the court held that the government could not benefit from the property's subsequent appreciation in value. The district court further held that while the Avilas could equitably subrogate to the four liens senior to the government lien, the Diemers could not subrogate because there was no subrogation agreement, the Avilas' conveyance to the Diemers did not include the Avilas' subrogation rights, and the Diemers had not satisfied those liens to protect their rights and interests in the property. *Id.* at 136. On August 3, 1994, the court entered an order in accordance with its opinion.

On February 17, 1995, the United States stipulated to dismissal of its action as to Mrs. Sylvester. App. 86. On March 30, 1995, the district court entered judgment for the Diemers and Citizens First National Bank of New Jersey because the parties agreed that the value of the property on October 3, 1980, $155,000, was only marginally above the value of the liens on the property with priority over the IRS lien, *i.e.* $154,318.[2] App. 90–91. Thus, the IRS lien was viewed as having no value. However, the March 30, 1995 order did not end the litigation because Mrs. Sylvester had filed a third-party complaint against Ticor and Chicago Title Insurance Company and a cross-claim against the other defendants, the Avilas and the Diemers. Mrs. Sylvester sued Chicago Title because she alleged that it was either the successor to or agent of Ticor.

On March 7, 1995, the district court entered an order, amended by an order entered on April 3, 1995, staying and administratively terminating Mrs. Sylvester's third-party complaint and cross-claims until the completion of an appeal in a related case then pending before the Superior Court of New Jersey, Appellate Division. App. 87–89, 92–94. In the state court the Avilas sought an order compelling Mrs. Sylvester to satisfy the IRS lien or to obtain its release. While the Avilas had been successful in the trial

---

**2.** The judgment included a finding that Mr. Sylvester had no equity in the property when he transferred it to his wife.

court, on appeal the Appellate Division held that the Avilas waived their right to insist that Mrs. Sylvester satisfy the IRS lien inasmuch as they took the title with an awareness of the lien and thus voluntarily and affirmatively relinquished their right to have it satisfied or released. The Appellate Division held that Ticor's mistake regarding the validity of the lien did not dictate a different result. *Avila v. Sylvester,* No. A–3391–91T5 (N.J.Super.Ct.App.Div. July 12, 1993), *certif. denied,* 134 N.J. 564, 636 A.2d 522 (1993).

The United States moved on May 17, 1995, for a certification under Fed.R.Civ.P. 54(b) and entry of a final appealable judgment with respect to its claims against the Diemers and Citizens First National Bank of New Jersey. App. 95–101. On May 31, 1995, the District Court granted the motion and entered a judgment in favor of the Diemers and the Citizens First National Bank of New Jersey in the foreclosure action and certified the case for immediate appeal. App. 102. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1340 and 1345 and 26 U.S.C. §§ 7402 and 7403, and, as the United States filed a timely notice of appeal, we have jurisdiction pursuant to 28 U.S.C. § 1291.

## B. DISCUSSION

■ The district court found that the value that the government could recover on its tax lien was limited to Mr. Sylvester's equity in the property at the time that he conveyed it to his wife. The court explained:

> The lien, in essence, vests the Government with the hope that in the debtor/taxpayer's hands his interest will appreciate in value, either due to an increase in his title or a rising real estate market. But that hope must be extinguished when the debtor/taxpayer no longer has any interest in the Property.

859 F.Supp. at 133. The court thus concluded, "the Government may receive a one-half interest in the Property valued at the time Mr. Sylvester transferred his title and interest to Mrs. Sylvester, subject to other liens

---

3. Since the court found that Mr. Sylvester possessed no equity in the property above the value

or mortgages that had priority." *Id.* at 134.[3] We hold that the district court erred.

The Supreme Court long has held that:

> [T]he transfer of property subsequent to the attachment of the lien does not affect the lien, for 'it is of the very nature and essence of a lien, that no matter into whose hands the property goes, it passes cum onere....' *Burton v. Smith,* 13 Pet. 464, 483, 10 L.Ed. 248; *see Michigan v. United States,* 317 U.S. 338, 340, 63 S.Ct. 302, 303, 87 L.Ed. 312.

*United States v. Bess,* 357 U.S. 51, 57, 78 S.Ct. 1054, 1058, 2 L.Ed.2d 1135 (1958). Fixing the value of the lien at the time the taxpayer transfers the property certainly "affect[s] the lien," and therefore *Bess* prohibits it. Consequently, we will reverse the district court's judgment.

■ In reaching our result we note that we are not the first court of appeals to consider the effect of changes in value after a lien has attached and the property transferred. Thus, the Court of Appeals for the Ninth Circuit in *Han v. United States,* 944 F.2d 526 (9th Cir.1991), considered exactly the same claim as we consider here:

> A tax lien 'shall continue until the liability for the amount so assessed ... is satisfied or becomes unenforceable by reason of lapse of time.' 26 U.S.C. § 6322 (1988). The IRS is authorized to seize liened property even if it has been sold to a third party. 26 C.F.R. 301.6331–1 (1990). Nowhere in the statutory or regulatory scheme is there a provision limiting the IRS's recovery. A lien continues unabated regardless of sale, so long as it is properly recorded.

*Id.* at 528–29. We agree with the *Han* court that, "[b]ecause the lien is unaffected by sale, we see no basis for fixing the amount of the lien at the time of sale." *Id.* See also *United States v. Blakeman,* 997 F.2d 1084, 1092–93 (5th Cir.1993) (rejecting defendant's argument that tax lien's value was limited to value at lien's attachment date), *cert. denied,* —— U.S. ——, 114 S.Ct. 687, 126 L.Ed.2d 654 (1994).

of the other liens at the time it was transferred, this interest was worthless. App. 90–91.

We observe that neither the appellees nor the district court has cited any direct case law support for the district court's approach. Thus, we are aware of no case which says that the value of the property securing a tax lien must be frozen when the taxpayer transfers it. Overall, we are satisfied that the lien continues to attach to Mr. Sylvester's entire former interest in the property, limited only by the amount of the debt it secures and, as we shall see, by the Diemers' right to equitable subrogation.

■ Our conclusion that the lien attached to the appreciated value of Mr. Sylvester's former interest requires that we consider the scope of that interest because the $580,000 sale to the Avilas in 1989 reveals that the lien may be attached to a property interest worth far in excess of $155,000. It is established that state law determines the scope of the property interest to which the lien attaches. *United States v. National Bank of Commerce*, 472 U.S. 713, 722, 105 S.Ct. 2919, 2925, 86 L.Ed.2d 565 (1985); *United States v. Mitchell*, 403 U.S. 190, 197, 91 S.Ct. 1763, 1768, 29 L.Ed.2d 406 (1971).

We must therefore consider the scope of Mr. Sylvester's former interest under New Jersey law. This inquiry raises three questions that stem from the unusual characteristics of a tenancy by the entirety when a non-debtor spouse who has acquired the debtor spouse's interest in encumbered property sells the property to a third party. We must determine whether: (1) the lien is subject to the non-debtor spouse's (Mrs. Sylvester's) right of survivorship after the property is transferred to a third party; (2) the lien remains attached to the debtor-spouse's (Mr. Sylvester's) right of survivorship after the property is transferred to a third party; and (3) the lien remains attached to only a one-half interest in the property or extends to the entire property after its transfer to a third party. As we shall see, the answers to these questions in this case depend on facts not of record and thus further proceedings will be required in the district court.

■ We start our analysis with *King v. Greene*, 30 N.J. 395, 153 A.2d 49 (1959), in which the New Jersey Supreme Court, after an exhaustive survey of the common law, found that:

> It is our view that the husband could, at common law, alienate his right of survivorship, or, more properly, his fee simple subject to defeasance.

*Id.* 153 A.2d at 59. After analyzing the effect of the Married Women's Act of 1852 on estates by the entirety, the *King* court concluded that "the judgment creditors of either spouse may levy and execute upon their separate rights of survivorship." *Id.* at 60. Thus, New Jersey long has recognized that a lien may attach to the interest of one spouse in property held by the entireties. In *Newman v. Chase*, 70 N.J. 254, 359 A.2d 474, 477 (1976), the New Jersey Supreme Court, discussing *King,* explained that "[e]ach tenant by the entirety is a tenant in common with the other during the joint lives of the spouses. Upon the death of a spouse, the survivor is then the sole owner."

More recently, the Supreme Court of New Jersey in *Freda v. Commercial Trust Co.*, 118 N.J. 36, 570 A.2d 409 (1990), made it clear that when the non-debtor spouse receives the debtor's interest in a property held as tenants by the entireties in a settlement pursuant to a divorce agreement, any lien previously attached to the debtor spouse's one-half interest in the property conveyed to the non-debtor spouse remains attached to that interest but that the non-debtor spouse retains a right of survivorship. As a result, if the debtor spouse predeceases the non-debtor spouse, the lien is extinguished upon the debtor's death. Moreover, it is clear from *Freda* that if the non-debtor spouse (who now owns the encumbered property after a divorce) predeceases the debtor spouse, the lien extends to the entire property based on the debtor spouse's right of survivorship. The *Freda* court explained that:

> Because of the nature of a tenancy by the entirety, a mortgage given by one tenant can encumber only the interest that tenant can transfer. That interest includes a right to possession or its fair value. It

also includes the right to become the sole owner on the death of the other tenant. *Id.* 570 A.2d at 414.

*Freda* also makes it clear that the non-debtor spouse's right of survivorship survives an equitable distribution following a divorce. The court explained that:

> The conversion through divorce of a tenancy by the entirety to a tenancy in common, however, need not enhance the lien of a secured creditor. The non-debtor spouse's right of survivorship, like the restriction on the purchaser's right to partition the property ... will constrain the value of the interest subject to the lien. Termination by divorce of the tenancy by the entirety does not mean that the mortgagee should be allowed to improve its position.

*Id.* at 415 (citations omitted).

Applying *Freda*, it is clear that after the divorce and equitable distribution, the IRS continued to hold its lien subject to Mrs. Sylvester's right of survivorship. Consequently, if the government were attempting to foreclose while Mrs. Sylvester still owned the property, our ruling would be clear. We would find that the lien could extend only to a one-half interest in a life estate for the joint lives of the Sylvesters and to the value of Mr. Sylvester's right of survivorship. A sale of the property still would be subject to Mrs. Sylvester's possessory interest and right of survivorship.

As we noted above, however, this case raises the question of whether Mrs. Sylvester's transfer of her interests to the Avilas affects the scope of the lien and the rights of survivorship. There are several possibilities here. For example, transfer of the property to the Avilas might have extinguished the Sylvesters' rights of survivorship, thus leaving the lien attached to a one-half interest in the property. There would be advantages in that result because it would eliminate uncertainty, definitively fix interests in property, and prevent the determination of property interests from depending upon the lives of persons who have no remaining connection to the property. We, however, are concerned with a state law question and we therefore

must determine the impact of Mrs. Sylvester's conveyance to the Avilas on the scope of the lien and the right of survivorship on the basis of New Jersey law, and not on the basis of what we think is convenient, or even sensible.

█ It is true that, as the district court observed, under New Jersey law a sale of property held in a tenancy by the entireties to a third party ordinarily terminates the right of survivorship. *United States v. Diemer,* 859 F.Supp. at 132. Had the Sylvesters together, or Mrs. Sylvester individually, conveyed the property to a third party with all liens on the property being extinguished at the time of the conveyance, the Sylvesters' rights of survivorship would not have survived the conveyance.

But *King* and *Freda* make it clear that under New Jersey law, the rights of survivorship are alienable property interests and because the IRS lien attached to Mr. Sylvester's interest while he still had a right of survivorship, we cannot hold that Mrs. Sylvester's conveyance to the Avilas destroyed the right of survivorship.[4] If we held that Mrs. Sylvester's conveyance destroyed that right, we would be holding that the owner of a property subject to a lien could impair the lien by her action in conveying the property. Thus, in the unusual circumstances of this case the rights of survivorship survived the sale of the property to the third party, *i.e.* the Avilas.

In its brief the government argues that Mrs. Sylvester's right of survivorship was extinguished when she conveyed the property to the Avilas, but it does not mention Mr. Sylvester's right of survivorship. This argument is consistent with the government's contention that at the time of the sale to the Avilas, "the federal tax lien attached to an outright undivided one-half interest in the property." Br. 12. Accordingly, the government in its brief does not make the same analysis of New Jersey law that we make and it does not urge that Mr. Sylvester's survivorship interest always has remained viable because of its lien. We mention this point because we consider but reject the possibility

---

4. *But see* footnote 6, *infra.*

that Mrs. Sylvester's right of survivorship could have been extinguished by her conveyance to the Avilas while Mr. Sylvester's survived. We are not aware of authority allowing such inconsistent treatment of the rights of survivorship and find that it will not arise as a matter of law.

■ We conclude, therefore, that to determine the property interest to which the government's lien is attached we have to know whether the Sylvesters have survived, a fact the record does not disclose. If both survive, then the lien remains attached to Mr. Sylvester's life estate and right of survivorship. If Mr. Sylvester predeceased Mrs. Sylvester the lien is extinguished. *See United States v. Rodgers*, 461 U.S. 677, 690–91 & n. 16, 103 S.Ct. 2132, 2141 & n. 16, 76 L.Ed.2d 236 (1983). If Mrs. Sylvester predeceased Mr. Sylvester the lien extends to the entire property.[5] Since the facts of Mr. and Mrs. Sylvesters' longevity are not in the record, we

will remand the case to the district court for the determination of whether the lien is attached to the property and, if so, to what extent, or whether it has been extinguished.[6]

■ The Diemers argue that they are entitled to equitably subrogate to the position of the lienors whose debts were satisfied when Mrs. Sylvester sold the property to the Avilas. The district court found that while the Avilas would have been entitled to equitably subrogate to the liens senior to the IRS lien, the Diemers were not so entitled, principally because they had not paid the debt of another with a view to protecting their rights and interests in the property and also because the Avilas' conveyance did not include their subrogation rights and there was no agreement to subrogate.[7] The significance of allowing equitable subrogation is that the IRS lien would remain subordinate to the liens satisfied at the time of the Avilas' purchase.[8]

5. The government filed this action in 1991 and accordingly it is possible that either or both of the Sylvesters were alive then but have died. We have written this opinion without taking into account the possibility that upon the filing of the lawsuit or the happening of some other event the subsequent death of either Sylvester would no longer affect the outcome of this case. We have not addressed this possibility because the parties have not mentioned it in their briefs. Consequently if the facts warrant, this point may be considered on remand. We are not suggesting that if the property is sold during the joint lives of the Sylvesters pursuant to the procedure we describe in note 6, *infra*, that the subsequent death of either would have any materiality with respect to a division of the proceeds.

6. On April 3, 1996, the court received a letter from Mrs. Sylvester's attorney indicating that she died on March 23, 1996. The letter, however, does not inform us whether Mr. Sylvester predeceased Mrs. Sylvester or whether he survived her. Consequently, notwithstanding the letter, the case must be remanded for further proceedings. We also point out that conceivably a death after this litigation was commenced may not change the outcome of the case. *See* note 5, *supra*.

*United States v. Rodgers*, 461 U.S. 677, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1982), makes it clear that if the government has a lien on a partial interest in a property the district court can order the property sold in fee simple and then compensate the owner or owners of the remaining interests from the proceeds of the sale for the value of their interests.

7. The government claims that the equitable subrogation argument was not appealed, apparently implying that we are bound to accept the district court's finding that equitable subrogation should not be allowed. Br. 9. We disagree with the implication. "[A]n appellee is entitled to rely on alternative arguments which had been raised in the district court supporting the judgment without filing a cross-appeal, so long as he or she is not seeking to expand his or her rights under the judgment or limit another's rights." *Deisler v. McCormack Aggregates, Co.*, 54 F.3d 1074, 1081 n. 12 (3d Cir.1995). While equitable subrogation would allow the appellees a remedy that is not precisely analogous to the district court's judgment that the government's recovery was limited to the taxpayer's equity in the property, nevertheless the equitable subrogation argument can be raised without a cross-appeal because appellees raise it to support the judgment, at least to the extent that the government's priority will be limited, if not eliminated, if we accept the equitable subrogation argument.

8. Ultimately, of course, the district court's ruling not allowing equitable subrogation did not matter because of the parties' later agreement that the value of the property barely exceeded the amount of liens senior to the IRS lien when Mr. Sylvester conveyed his interest in the property to Mrs. Sylvester. The parties' agreement meant that the IRS lien was worthless because the district court froze the value of the property subject to the lien at the time Mr. Sylvester conveyed his interest in the property to his wife. But in view of our conclusion rejecting that holding, and depending on the longevity of the Syl-

We start our equitable subrogation analysis with section 6323(i) of the Internal Revenue Code, which provides that "[w]here, under local law, one person is subrogated to the rights of another with respect to a lien or interest, such person shall be subrogated to such rights for purposes of any lien imposed by section 6321 or 6324." 26 U.S.C. § 6323(i). Therefore, we must determine whether, as a matter of New Jersey law, the Avilas could subrogate to the interests of the superior lien holders who were paid when the Avilas acquired property from Mrs. Sylvester, and, if so, whether the Diemers could succeed to the Avilas' right of equitable subrogation.

It is clear that if the Avilas were unaware of the tax lien, they would have been permitted to equitably subrogate to the position of the senior lienholders paid when they acquired the property. In fact, they purchased the property in the mistaken belief that the government tax lien was invalid and consequently their purchase money was used to discharge the liens senior to the IRS lien on the basis of this mistake. In effect, therefore, they were in the same position they would have been if their title search simply had not disclosed the properly filed IRS lien.

The New Jersey Superior Court, Appellate Division, described the doctrine of equitable subrogation:

> There is no doubt that a mortgage[e] who negligently accepts a mortgage without knowledge of intervening encumbrances will subrogate to a first mortgage with priority over the intervening encumbrances to the extent that the proceeds of the new mortgage are used to satisfy the old mortgage. This result is reached so that the holders of the intervening encumbrances not be unjustly enriched at the expense of the new mortgagee.

*Trus Joist Corp. v. National Union Fire Ins. Co.*, 190 N.J.Super. 168, 462 A.2d 603, 609 (App.Div.1983), *reversed on other grounds,* 97 N.J. 22, 477 A.2d 817 (1984). *See also* 29 Roger A. Cunningham & Saul Tischler, N.J. Practice, Law of Mortgages § 145 at 669 (1975) ("If the grantee-payor did not know of the existence of a junior encumbrance when he purchased, and did not 'assume' or take 'subject to' *all* encumbrances, the better view is that he may be entitled to keep the mortgage alive and enforce it by subrogation. . . ."). Thus, as the district court found, the Avilas equitably subrogated to the liens with priority over the IRS liens when they acquired the property and which were paid at that time.

The next question we must decide is whether the Avilas transferred their equitable subrogation rights to the Diemers. The Diemers, of course, were in a different position with respect to a *direct* right of equitable subrogation than the Avilas for two reasons. First, unlike the Avilas, they had actual knowledge when they acquired the property that the IRS lien was valid. Second, their purchase money was not used to satisfy the prior liens.

To begin our analysis, we note that N.J. Stat. Ann. § 46:3–13 (West 1989) states:

> Every deed conveying lands shall, unless an exception be made therein, be construed to include all the estate, right, title, interest, use, possession, property, claim and demand whatsoever, both in law and equity, of the grantor . . .

By its clear provisions this section includes any claims to equitable subrogation that a grantor might possess. In this case, it is clear that equitable subrogation was a claim in equity of the grantors, the Avilas. Thus, the deed from the Avilas to the Diemers included the Avilas' equitable subrogation rights.[9] Consequently, the Diemers' knowledge that the IRS lien was valid when they acquired the property, and the fact that their money was not used to satisfy the prior liens, simply are not germane with respect to whether they should be allowed to equitably

---

vesters, the equitable subrogation issue again is significant.

9. The district court in its conclusion that the Diemers did not equitably subrogate observed that section 46:3–13 "does not create a right of subrogation." *United States v. Diemer,* 859

F.Supp. at 136. While we agree with this observation we do not understand its significance because section 46:3–13 is germane to whether the right of equitable subrogation was transferred, not created.

subrogate. In short, principles governing the right to *direct* subrogation cannot be applied in this case which involves *derivative* subrogation. The issue here is simply whether the Diemers can exercise the Avilas' subrogation rights.

█ We also point out that the chief rationale for allowing equitable subrogation is to prevent the junior encumbrancer from being unjustly enriched at the expense of a new purchaser or mortgagee of the property. Thus, courts permit equitable subrogation even when the purchaser is negligent in not learning of the junior encumbrance. *See Home Owners' Loan Corp. v. Collins,* 120 N.J. Eq. 266, 184 A. 621, 623 (1936). *See also* 29 N.J. Practice § 145 at 669 ("And negligence which has not resulted in harm to anyone should not be invoked to permit unjust enrichment of the later lienors through their unearned and fortuitous advancement in priority by reason of the mistake of the grantee in paying and taking a discharge instead of an assignment.").

Accordingly, in our analysis of whether the right to equitable subrogation passed to the Diemers we focus on the effect of allowing subrogation on the IRS rather than on the Diemers' knowledge when they acquired the property or how their funds were used. It is clear that the IRS would be as unjustly enriched by denying equitable subrogation to the Diemers as it would have been if equitable subrogation had been denied the Avilas. The court in *Han v. United States,* which we quoted in our discussion with regard to the lien attaching to the enhanced value of the property after Mr. Sylvester conveyed his interest in it to Mrs. Sylvester, noted:

> We are unimpressed by the IRS's repeated claims that its victory would neither unjustly enrich nor produce a windfall in favor of the United States. One cannot fail to see this case as an attempt by the IRS to require the [grantee] to pay a portion of [grantor]'s delinquent taxes. The IRS's claim that equitable subrogation

would make it the victim of 'injustice' is thoroughly unconvincing.

*Han v. United States,* 944 F.2d at 530 n. 3.

It is true that it has been said that "subrogation is effective only where the new mortgagee is without actual knowledge of the existence of junior encumbrances." *Metrobank for Sav., FSB v. Nat'l Community Bank of New Jersey,* 262 N.J.Super. 133, 620 A.2d 433, 438 (App.Div.1993). But this rule exists to encourage explicit subrogation agreements when it is possible for the grantee to negotiate with the senior lien holders. Consequently, the relevant party's knowledge of junior encumbrances must be that of the initial grantees or mortgagees, *i.e.* the Avilas, and not that of their successors in interest, *i.e.* the Diemers. After all, a successor's knowledge of a junior encumbrance when the successor acquires the property could not assist the initial grantee or mortgagee in retroactively reaching an agreement for an assignment of a lien with a senior lien holder. Therefore, it makes no sense to prevent successor parties in interest to a property from benefiting from the equitable subrogation allowed their grantors.[10]

We also note that unless property owners entitled to equitably subrogate can assign their equitable subrogation interests, in effect they lose their equitable subrogation interests when they convey the property. Thus, if the Avilas could not place the Diemers in their shoes, the Avilas owned a greater interest in the property than they could convey since their conveyance would impair the estate they conveyed. We are confident that the New Jersey Supreme Court would not reach such an anomalous result.

There is a persuasive analogy to the situation before us under the Uniform Commercial Code which ordinarily permits a holder in due course of an instrument to vest in the transferee "such rights as the transferor has therein." N.J. Stat. Ann. § 12A:3–201(1) (West 1962). Thus, just as the purchaser of a note from a holder in due course can shelter behind the holder in due course even

---

10. *Cf.* 29 N.J. Practice, Law of Mortgages § 145, at 672 (" If the grantee has no knowledge of junior encumbrances when he purchases mortgaged land, knowledge thereof at the time when he pays the mortgage debt should be immaterial unless he clearly manifests the intent to extinguish the mortgage for the benefit of the junior encumbrancers.").

though the purchaser is aware of a maker's personal defenses when the purchaser acquires the note, the Diemers should be able to shelter behind the Avilas with respect to the latters' right to equitable subrogation.[11] Overall we therefore conclude that once the district court reached the correct result that the Avilas could equitably subrogate, the court should have permitted the Diemers to exercise those same rights derivatively. Thus, we hold that the court's failure to allow the Diemers to exercise the right to equitably subordinate was an error regardless of whether we exercise plenary review or review the district court's ruling on a deferential abuse of discretion standard.[12]

In its reply brief, the government argues that since the Diemers paid $480,000 for the property and the Avilas three years earlier paid $580,000, "the facts of the record strongly support the inference that the Diemers themselves did know of the existence of the federal tax lien, and discounted the purchase price to reflect the possibility that that lien, considered to be invalid by the title insurance company, might still remain against the property." Reply Br. 10. We have no doubt that the Diemers knew that the tax lien was valid because when they bought the property it was in foreclosure. We do not know if they received a discount by reason of the lien and the foreclosure proceedings, though we acknowledge that it is possible that they did because they were buying into a lawsuit with its risks, aggravation, and expenses. Yet even receipt of a discount in purchase price

should not matter because the reasons for allowing the Diemers to subrogate are in no way compromised by any agreement they made with the Avilas since the Diemers' right to subrogate is derivative of the Avilas' subrogation rights. Thus, we need not remand for a determination of whether the $100,000 drop in the property's price between the Avilas' and the Diemers' purchases reflects changes in real estate values or other circumstances independent of any discount the Diemers may have obtained in recognition of the government lien.[13]

## C. CONCLUSION

The district court found that the value of the government tax lien could not exceed the equity that Mr. Sylvester, the taxpayer, possessed in the property when the taxpayer conveyed it. For the reasons we explain above, we reject this conclusion. The lien is limited by the extent of the taxpayer's interest in the property and not by the value of the taxpayer's interest when he conveys it. Under New Jersey law, the extent of this interest depends upon the relative longevities of Mr. and Mrs. Sylvester. We also conclude that the Diemers are entitled to equitable subrogation to the four liens on the property which Mrs. Sylvester satisfied when she sold the property to the Avilas. In view of our conclusions we will reverse the order of August 3, 1994, and the judgments of March 30, 1995, and May 31, 1995, and will remand the matter to that court for a determination of the interest, if any, in the property to which

11. While we hold that the Diemers may equitably subrogate to the four liens senior to the IRS lien paid when the Avilas acquired the property, we do not determine how to calculate the value of the liens. The parties' briefs do not address this significant issue which can be addressed on remand.

12. In *Metrobank for Sav., F.S.B. v. Nat'l Community Bank of New Jersey,* 620 A.2d at 439, the court pointed out that as "an equitable doctrine, subrogation is applied only in the exercise of the court's equitable discretion." We are uncertain whether the New Jersey courts therefore would apply an abuse of discretion standard in determining whether a purchaser of a property interest from a seller entitled to equitably subrogate could derivatively exercise the subrogation rights but in view of our conclusion that it was an abuse of discretion not to allow the Diemers to

subrogate, we need not resolve the standard of review issue.

13. We make one final observation on the equitable subrogation point. As we have noted, the district court held that "the Government may receive a one-half interest in the Property valued at the time Mr. Sylvester transferred his title and interest to Mrs. Sylvester, *subject to other liens or mortgages that had priority." United States v. Diemer,* 859 F.Supp. at 134 (emphasis added). The "subject to" language related to the valuation of Mr. Sylvester's interest in the sense that the other liens and mortgages with priority would reduce the valuation. Consequently, the district court in effect did allow the Diemers to claim the value of these liens against the government's lien even though the court said that the Diemers could not subrogate to these liens.

the lien is attached and, if necessary, to make an appropriate allowance for equitable subrogation, and to undertake further proceedings consistent with this opinion.