**UNITED STATES of America,
Plaintiff,**

v.

**Harold MORRELL and Michael
F. Morrell, Defendants.**

**No. 97 CV 5344(NG).**

United States District Court,
E.D. New York.

March 23, 2001.

Stephen T. Lyons, Tax Division, Department of Justice, Washington, DC, for plaintiff.

Paula Schwartz Frome, James Druker, Kase & Druker, Gardon City, NY, for defendant.

## *ORDER*

GERSHON, District Judge.

The United States moves pursuant to Rule 56, Fed.R.Civ.P., for summary judgment to declare the validity of certain tax liens and to order foreclosure on the liens and sale of property, consisting of a residence conveyed by taxpayers to their son and an annuity traceable to securities that had been transferred by taxpayers to their son, that is subject to the liens. Defendants oppose the motion, arguing that there are factual issues for trial: (1) that the son's interests in the real and personal property that had been transferred to him are superior to the tax liens; (2) that some of the funds used to purchase the annuity came from the son's independently accumulated assets, or alternatively, from property transferred by the taxpayers before the liens attached; and (3) that the government is not entitled to the appreciation in the value of assets after the transfers by the parents to the son.

### The Facts

The facts, which in part are set forth in a Joint Agreed Statement of Material Facts ("Joint Statement") entered into by the parties, are undisputed except as indicated. Defendant Harold Morrell invested in tax shelters and claimed deductions on his joint income tax returns filed with his wife, Dolores Morrell, for the years 1977—1980.[1] The IRS disallowed the deductions for these four years and assessed deficiencies. Harold and Dolores Morrell contested the deficiencies in Tax Court. On August 13, 1990, the Tax Court entered an agreed decision finding deficiencies for those years, exclusive of interest, of $182,

---

1. Dolores Morrell died after this action was commenced and is no longer a party.

645, which with interest had grown to over $750,000 as of the date of the decision and approximately $1.4 million when the parties entered into the Joint Statement.

The IRS separately assessed the deficiencies and demanded payment for each of the years 1977—1980 between November 15 and December 10, 1990, thereby creating liens against all property of Harold and Dolores Morrell pursuant to 26 U.S.C. §§ 6321 and 6322. These statutes provide that a lien attaches at the time of assessment to "all property and rights to property" of the taxpayer for the amount of the assessment, including interest that may accrue, and continues until the liability is satisfied or becomes unenforceable by lapse of time. Tax liens were filed against Harold and Dolores Morrell in Suffolk County on September 11, 1991. Harold Morrell does not contest the deficiencies, and agrees that judgment should be entered against him for the full amount of the liability.

Harold and Dolores Morrell transferred real estate, stocks and other securities to their son, defendant Michael F. Morrell. The real estate, a home in Suffolk County having a fair market value of approximately $400,000 at the time, was transferred by deed dated May 24, 1991, after the assessment and attachment of the government's lien.[2] Harold and Dolores Morrell continued to reside there after the transfer as they had before. There was no mortgage on the property. Harold and Dolores Morrell also transferred to Michael Morrell in May 1991 their holdings in municipal trusts worth over $217,000. The transfer was effectuated by transferring the holdings from the parents' account at Dean Witter to Michael's account at Dean Witter. Michael subsequently transferred the municipal trusts to a joint Dean Witter account of Michael and his spouse. In April 1992, Harold and Dolores Morrell transferred stock holdings worth approximately $200,000 from their Dean Witter account to the Dean Witter account of Michael and his spouse.

Harold Morrell claimed in his deposition that all of these transfers, which admittedly followed the assessment, were not undertaken to avoid payment of tax deficiencies. Instead, he asserted, the assets were transferred in light of the declining health of Dolores Morrell, so that the parents would qualify for government medical assistance. Michael Morrell testified in his deposition that he shared the same understanding of the reason for the transfers of assets, and was not aware at that time of his parents' tax difficulties. For purposes of the summary judgment motion, the government does not contest motivation, but asserts that it is entitled to foreclose on its liens regardless of motivation.

Michael Morrell's assertion of an interest superior to the government liens is based upon the defendants' claim that in exchange for the transfer of assets, Michael orally agreed to support his parents and in fact did so. Defendants argue that Michael Morrell therefore is a "purchaser" protected under 26 U.S.C. § 6323(a) or, alternatively, that he is entitled to an equitable lien for the hundreds of thousands of dollars he spent to support his parents over the years following the transfers of assets.

Harold Morrell testified at his deposition that he and his wife transferred their residence, stocks and securities pursuant to a unitary plan to divest themselves of all assets, and that no other assets were left

---

**2.** The parties agree that the fact that certain transfers were made after the attachment of the liens but preceded their filing, is not determinative in this case.

after the transfers.[3] Harold Morrell testified as follows as to the timing of the alleged support agreement in relationship to the transfer of property:

Q. In connection with the transfer of the assets, did your son later make some promises to you as to what he would do for you?

A. Well, we had set up for a planned estate, and he agreed after we transferred everything over to his name he would support us. We were concerned about our health, my wife's health, which subsequently has died, but concerned about Medicare, so we didn't want to have anything around. So we made a deal. We decided that we'll have Michael take everything now and then support us so that we wouldn't be exposing the assets to Medicaid.

\*  \*  \*  \*  \*  \*

Q. At the time of the transfers that you made to your son, had your son agreed to give you support?

A. Yes.

\*  \*  \*  \*  \*  \*

Q. And your recollection is that his promise for the support was before the transfers were made, not after?

A. I don't remember whether it was before or after. I don't remember that part, before or after.

Q. It could have been one or the other?

A. Yeah, it could have been.

\*  \*  \*  \*  \*  \*

Q. Everything was oral?

A. Oral.

Q. Did your son ever tell you what he would do for you in the way of providing you support?

A. He would support us the way we were——the way we lived, you know.

Michael Morrell admitted at his deposition that he first found out about the transfer of property to him during a telephone call from his father saying, "here is what I've done, and I'm really doing this because of these Medicare issues." As far as Michael knew, the documentation for effecting the transfer of securities consisted simply of a name change in ownership of the Dean Witter account. Michael Morrell testified that the circumstances surrounding the support arrangement "was simply, We're going to give you this money, and, you know, I agreed to support them. I mean it was no——there was no formal arrangement." Michael reiterated that he thought "the transfer took place and then we had the discussion," which could have taken place one or two months after the transfer. The discussion was: "I would just pay all their expenses." In the deposition, Michael Morrell recollected that the transfer of securities occurred after the real estate had been transferred; he believed the transfer of securities took place in late 1991.

Michael Morrell's affidavit submitted in opposition to the summary judgment motion simply states, in reference to the purported agreement: "In exchange for the transfer of the assets, I agreed to support my parents for their lifetime," and that he "kept that promise" by the substantial deposits to his parents' bank accounts and his purchase of a townhouse in 1996 where his father lives rent free. The affidavit identifies the transferred assets as his parents' entire portfolio of stock and municipal bonds, and their home. The affidavit states that the home was transferred in

---

**3.** Harold and Dolores Morrell in fact continued to retain ownership of a condominium, but the government is not seeking to foreclose on that property in this proceeding.

May 1991, and the securities in May 1991 and April 1992.

In October 1995, Michael Morrell liquidated his joint Dean Witter account and used all of the proceeds to purchase a variable annuity for approximately $833,000. The government claims that its lien attaches to the entire amount of the annuity, which had increased in value to over $1 million as of March 31, 1998. In opposition to the summary judgment motion, Michael Morrell claims that at least $380,000 in the Dean Witter account that was used to purchase the annuity represented separate savings accumulated by Michael and his wife and did not come from his parents. Michael also argues that the government should not be entitled to payment of the portion of the proceeds from his Dean Witter account used to purchase the annuity that represents appreciation in the Dean Witter account; Michael attributes that appreciation in asset value to his prudent and skillful management of the account.

The government agrees in principle that, to the extent that Michael could show that a portion of the annuity was purchased with funds that were not traceable to transfers from his parents after the lien attached, Michael would be entitled to retain a *pro rata* share of the proceeds of the annuity. However, the government contends that there is no genuine factual dispute that all of the funds in the Dean Witter account that were used to purchase the annuity are traceable to transfers made by Harold and Dolores Morrell after the tax liens had attached. The government also contends that, since the lien follows the property, it is entitled to foreclose on the entire value of the annuity, including any appreciation in value of the annuity or the Dean Witter fund used to purchase the annuity, until the deficiency,

including accrued interest, is fully satisfied.

The property that Michael Morrell asserts had been purchased with his own funds is a tax free fund of Dean Witter. Neither Harold Morrell nor Michael Morrell produced most of their securities account records in discovery for the critical period of 1990 through the first few months of 1992, which would have shown all holdings and activity in the accounts in the periods preceding and following the assessments. Michael Morrell's affidavit in opposition to summary judgment attached his Dean Witter account statement for June 1991, which reflected a holding of 33,769 shares of Dean Witter New York Tax Free Inc. Fund, then worth approximately $378,000, as well as approximately $2,000 in a U.S. government money market fund. Michael claimed that these investments were acquired with his own funds and were not derived from property his parents transferred to him. Michael explained his failure to produce that statement and others or to discuss those holdings at his deposition by stating that he had only recently located some of these records, and that his memory had been impaired because of a heart condition. Michael Morrell did not produce any records that showed that he in fact purchased shares of this tax free fund from his own savings. The government responded to this new information by obtaining other records from Dean Witter, including the account statement for Harold and Dolores Morrell as of April 30, 1990, showing that the exact same quantity, 33,769 shares of Dean Witter New York Tax Free Inc. Fund, then worth approximately $364,000, was held in the parents' account.

Because the account statements produced by the defendants and those obtained by the government from Dean Witter are incomplete, there is a gap between

the April 1990 statement of the taxpayers and the June 1991 statement of Michael Morrell. Therefore, no document shows when, after April 1990, the 33,769 shares of Dean Witter New York Tax Free Inc. Fund were withdrawn from the taxpayers' account or where it went, or when, before June 1991, 33,769 shares of Dean Witter New York Tax Free Inc. Fund first were carried in Michael's account or where it came from. Defendants argue that there are factual issues, precluding the granting of summary judgment to the government, as to whether this fund was transferred from the parents to Michael Morrell, and if it was, when the transfer took place, *i.e.*, before or after the tax liens attached in November and December, 1990.

Examination of the Dean Witter monthly statements for the account of Michael Morrell and his spouse from the end of 1991 until its liquidation in October and November 1995, when Michael used the entire proceeds to purchase the annuity, confirms the government's assertion that no new money or other assets were put into the account except for securities transferred by Harold and Dolores Morrell in April 1992. Defendants were afforded an opportunity after oral argument to identify any such assets that Michael put into the account, but their counsel notified the court that they had no further information to offer. The account statements show that there were few purchases and sales of securities, except for liquidations to withdraw funds from the account, and that all purchases of securities in the account during this time period were made with the proceeds from redemption of other securities held in the account and accumulated dividends and interest from those securities. Although Michael Morrell placed no new money in the account, he frequently made withdrawals from it between December 1992 and September 1995, for a total of approximately $119,000.

The record contains no explanation of these withdrawals. As a result of these withdrawals, there was in fact negligible increase in the value of the account: it had a value of approximately $778,000 on March 31, 1992, $807,000 on November 30, 1992, $781,000 on February 28, 1995, and $814,000 on May 31, 1995, before being liquidated for approximately $833,000 in October and November, 1995.

## Discussion

### Summary Judgment Standards

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *See id.* A material fact is one whose resolution would "affect the outcome of the suit under governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the nonmoving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986). Nor may the non-moving party "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.,* 475 U.S. at 586, 106 S.Ct. 1348. The party must produce specific facts sufficient to establish that there is a genuine factual

issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### "Purchaser" Under 26 U.S.C. § 6323(a)

■ Section 6323(a) of Title 26, United States Code, provides that "[t]he lien imposed by section 6321 shall not be valid as against any purchaser" until notice of the lien has been filed. A "purchaser" is defined in Section 6323(h)(6) as "a person who, for adequate and full consideration in money or money's worth, acquires an interest . . . in property which is valid under local law against subsequent purchasers without actual notice." The Treasury Regulations define "adequate and full consideration" to require "consideration in money or money's worth having a reasonable relationship to the true value of the interest in the property acquired." 26 C.F.R. § 301.6323(h)–1 (f)(3). "Money or money's worth" is defined in the regulation as including "tangible or intangible property, services and other consideration reducible to a money value," but excluding such things as "love and affection . . . or any other consideration not reducible to a money value." *Id.* § 301.6323(h)–1(a)(3).

No reasonable juror could find that Michael Morrell was a "purchaser" within the meaning of this provision. First, defendants conceded during oral argument of the summary judgment motion that the purported oral agreement by Michael Morrell to support the taxpayers for their lives is unenforceable under the statute of frauds. Obviously, an unenforceable promise of future support is not "adequate and full consideration in money or money's worth" under any rational construction of the statute.

Second, there is no genuine issue of fact as to the existence of an agreement, even an oral one, in which Michael Morrell furnished consideration in exchange for which Harold and Dolores Morrell transferred these properties to him. Michael Morrell testified at his deposition that his best recollection was that any discussion he had with his father concerning support occurred after the property had already been placed in his name by the unilateral action of his parents. Viewed most favorably to him, Harold Morrell admitted that he could not recall whether any such discussion preceded or followed the transfers. Accordingly, there is no basis for a reasonable jury to find that consideration was furnished in exchange for the transfers of property, even if any such promise would have been enforceable.

Third, even if there had been an agreement that was enforceable before the transfers took place, Michael Morrell's promise to support his parents is not "adequate and full consideration in money or money's worth" for the immediate conveyance of unencumbered assets worth over $800,000 (or almost $1.2 million when the Dean Witter New York Tax Free Inc. Fund is included, see pp. 13–14 *infra* ). The issue of adequate consideration is a matter of federal and not state law, and as the Second Circuit has stated, "a finding that [taxpayer] conveyed the Property to her daughters for adequate consideration under New York law, while helpful, does not provide a rule of decision that [the daughters] are federally protected 'purchasers' under Section 6323(a)." *United States v. McCombs,* 30 F.3d 310, 330 (2d Cir.1994). Nevertheless, in the absence of reported federal cases construing Section 6323's requirement of "adequate and full consideration" when the consideration furnished by the reputed purchaser is a promise of parental support, and notwithstanding the variations in statutory language, the New York decisions that have construed the requirement of "fair consideration" under Section 273 of New York Debtor and Creditor Law in similar cir-

cumstances are persuasive.[4] Courts have rejected repeatedly the argument that promises of future support constitute fair consideration within the meaning of Section 273. *Schmitt*, 98 A.D.2d at 936, 471 N.Y.S.2d 365 (purchaser's promises to take over payments on mortgage, furnace and taxes, to permit debtors to remain in house rent-free, and to convey ten acres to debtors' sons did not constitute "fair consideration" under § 273; "[s]uch promises ... are akin to promises of future support, which are insufficient as a matter of law to be considered a fair equivalent of the property transferred"); *Petition of National City Bank of New York*, 269 A.D. 1040, 58 N.Y.S.2d 620 (2d Dep't 1945) (promise of future support is not fair consideration); *see United States v. Bushlow*, 832 F.Supp. 574, 582 (E.D.N.Y.1993) (promises of future services are not "fair consideration" under § 273).

Defendants concede that Harold and Dolores Morrell divested themselves of virtually all their assets when they conveyed their real and personal property to their son, which rendered them unable to satisfy their tax obligations, and received nothing in return except at most an oral promise of support. It is not reasonable to find this promise to be "adequate and full consideration in money or money's worth."

### Equitable Lien

■ Defendants argue that, even if Michael Morrell is not a purchaser within the meaning of Section 6323(a), he is entitled to an "equitable lien," that is superior to the government's lien, for the hundreds of thousands of dollars he spent to support his parents. Pursuant to 26 U.S.C. § 6323(i)(2), equitable subrogation applies in certain circumstances where a transferee of property or a junior lienor has satisfied a lien that is superior to the tax lien. The statute provides: "Where, under local law, one person is subrogated to the rights of another with respect to a lien or interest, such person shall be subrogated to such rights for purposes of any lien imposed by section 6321." Equitable subrogation is designed to avoid the unjust enrichment that would occur if the government could reap the benefit of having the senior lien satisfied but deprive the party who satisfied that senior lien of any benefit in a foreclosure proceeding. To avoid such unfairness, the party that satisfied the senior encumbrance is allowed to assume the position that had been occupied by the original holder of the senior lien, if equitable subrogation is authorized by state law. *See United States v. Avila*, 88 F.3d 229, 237–39 (3d Cir.1996); *Mort v. United States*, 86 F.3d 890, 893–95 (9th Cir.1996); *Progressive Consumers Federal Credit Union v. United States*, 79 F.3d 1228, 1234–37 (1st Cir.1996).

Even assuming *arguendo* that the Second Circuit would recognize a non-statutory equitable doctrine applicable to tax liens, equitable principles do not point to the relief requested.[5] Michael Morrell did not satisfy a senior encumbrance on any of

---

**4.** N.Y. Debtor & Creditor Law § 273 declares that any conveyance made by a person who is thereby rendered insolvent is constructively fraudulent as to creditors regardless of the transferor's "actual intent if the conveyance is made or the obligation is incurred without a fair consideration." Section 272 provides that "fair consideration" is given for property when, as a fair equivalent for it and in good faith, property is conveyed or an antecedent

debt is satisfied, or when the property is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property. *Schmitt v. Morgan*, 98 A.D.2d 934, 935, 471 N.Y.S.2d 365 (3d Dep't 1983), *appeal dismissed*, 62 N.Y.2d 914, 479 N.Y.S.2d 9, 467 N.E.2d 893 (1984).

**5.** In *McCombs*, 30 F.3d at 333, the court in dictum apparently applied the equitable sub-

these properties; indeed, there was no mortgage on the real property. Nor did Michael's payments to his parents confer any benefit upon the government. Michael Morrell received property from his parents that they should have used to satisfy their indebtedness to the government and then gave money back to his parents so that they could continue to live in the same style as that to which they were accustomed, as if they had never incurred liability pursuant to an agreed judgment. Equity is not served by giving Michael Morrell credit for these payments to his parents.

### Source of Funds for Annuity

It is undisputed that the residence and over $400,000 worth of securities were transferred from Harold and Dolores Morrell to Michael Morrell after the assessments were made. On review of the entire record, the undisputed facts also establish that additional securities worth approximately $380,000, consisting of 33,769 shares of Dean Witter New York Tax Free Inc. Fund also were transferred to Michael by his parents. With no supporting documentation of any kind, Michael Morrell claims that he purchased the 33,769 shares of the Dean Witter New York Tax Free Inc. Fund with his own money. There is no explanation for the astounding coincidence that a year before, the taxpayers had the exact same number of shares of the same fund in their account. Moreover, Harold Morrell testified that he transferred all of his assets to his son, ostensibly so that Harold and Dolores could qualify for government medical assistance, and defendants offer no other EXPLANATION for the fact that the 33,769 shares of the fund the parents held in 1990 were no longer owned by them later. Since all other securities were conveyed from parents to son by directing transfer of the securities from the parents' Dean Witter account to the son's Dean Witter account, there is no rational basis for concluding that the 33,769 shares in Michael Morrell's account had not also been transferred in the same manner.

Furthermore, no rational juror could find that the transfer of this fund was made by the parents to their son before the liens had attached. As set forth in the Facts section above, Harold Morrell testified that the transfer of all assets held by him and his wife to Michael took place pursuant to one plan to divest themselves of all assets. Michael Morrell testified that all securities he received from his parents were transferred after the residence had been conveyed to him; it is undisputed that the real property was transferred approximately six months after the assessments. The parties agree that the assessments were made in November and December 1990, the real property was conveyed in May 1991, and that other securities were transferred in May 1991 and April 1992. Accordingly, there is no basis in the undisputed evidence for finding that the Dean Witter New York Tax Free Inc. Fund was transferred before the assessments.

### Appreciation

■ Michael Morrell's argument that the government is not entitled to foreclose on the annuity to the extent that it represents appreciation in the value of the security holdings after the transfers of assets from the taxpayers is erroneous. He does not question the well-settled principle that the lien follows the property. "The transfer of property subsequent to the attachment of the lien does not affect the lien, for 'it is of the very nature and essence of a lien, that no matter into whose hands the property goes, it passes cum onere ....'" *United States v. Bess*, 357 U.S. 51, 57, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958) (citations

rogation doctrine of § 6323(i)(2) without cit-

ing the statute.

omitted). This principle has been held to mean that the lien attaches to any appreciation in the value of the property until the taxpayer's liability has been discharged. *Avila*, 88 F.3d at 231, 233–34 (government lien is not limited to taxpayer's equity when he conveyed the property subject to the lien, it also attaches to the appreciation in the value of the property after the conveyance); *Han v. United States*, 944 F.2d 526, 528–29 (9th Cir.1991) (same); *see United States v. Librizzi*, 108 F.3d 136 (7th Cir.1997) (government's lien extended to appreciated fair market value of deceased taxpayer's interest in the property at the time of foreclosure and is not limited to value at death).

Furthermore, the premises of defendant's argument, that the annuity was purchased with appreciated assets and that the appreciation is attributable to Michael Morrell's skillful and prudent management of his Dean Witter account, are unfounded under the undisputed facts recited earlier. Almost all of the appreciated value in the Dean Witter account was taken out of it by Michael between 1992 and the account's liquidation in late 1995; and, with the inclusion of approximately $380,000 from the New York Tax Free Inc. Fund that defendant omitted in advancing his contention, the remaining minimal appreciation is attributable to passive reinvestment of interest and dividends which there is no persuasive reason to exempt from the government lien.

### Conclusion

The motion of plaintiff United States of America for summary judgment is granted. The government should submit a proposed judgment on fourteen days' notice to the defendants.

**SO ORDERED.**